# Richmond.

## MILLER & CO. v. LYONS.

### March 14, 1912.

1. CONTRACTS—*Waiver—Estoppel.*—Covenants and stipulations made by a covenantor for his own benefit may be waived by him, either by express terms, or by a course of dealing. So, also, a covenantor may, by his course of dealing with the covenantee, so lull him into a sense of security as thereby to estop himself from the exercise of a right for which he had contracted.

2. BROKERS—*Sale of Stocks—Notice to Owner—Terms of Contract—Course of Dealing—Estoppel.*—Although a broker may have reserved the right to sell, without notice, stocks carried by him on margin for a customer, yet if the acts, declarations, or course of dealing on the part of the broker, with full knowledge of the facts, have been such as to lead the customer to believe that he would not exercise his right to sell without giving the customer timely notice, he is estopped from setting up his right to sell under the contract, when sued for a loss incurred by reason of a sale made in derogation of such course of dealing.

3. TRIAL—*Dual Theories—Brokers—Breach of Contract.*—Where there has been such a violation of a course of dealing between a broker and his customer, and also of a special contract, as entitles the customer to recover damages from the broker for an improper sale of stock carried by him on margin for a customer, the latter may ground his action against the broker on both theories of the case. The two are not inconsistent, and the customer may advance both before the jury, introduce evidence in support of each, and ask the court to instruct the jury with respect to both.

4. DAMAGES—*Measure of—Conversion of Stocks.*—Where stocks have been illegally converted, the measure of damages which the owner is entitled to recover is the highest intermediate value of the stock between the time of its conversion and a reasonable time after the owner has received notice of it so as to enable him to replace the stock. What is such reasonable time is dependent upon the facts of the particular case. In the case at bar, twenty-one days was held to be a reasonable time.

Error to a judgment of the Circuit Court of the city of Richmond

in an action of assumpsit.  Judgment for the plaintiff.  De-
fendants assign error.

*Affirmed.*

### PLAINTIFF'S INSTRUCTIONS GIVEN.

"1. The jury are instructed that the relation between the plaintiff
and defendants in this case was that of pledgor and pledgee, with
the right in the defendant to exercise all powers of sale of the
securities mentioned in the evidence as having been sold, as are
set forth in the defendant's statement of purchases, unless modified
or lessened by the defendant's conduct or acts towards the plaintiff,
as explained in subsequent instructions.

"2. The jury are further instructed that the pledgee or defendant
had the right to exact strict performance of the contract according
to its terms, and, upon default on the part of the plaintiff to comply
with its terms, to sell the stock held by the defendant.  But strict
performance of such contract by the plaintiff may be waived by
any agreement, or course of conduct on the part of the pledgee,
or defendant, *and*, if there be any such, which reasonably led
the plaintiff to believe that a sale would not be made without an
opportunity being given him to increase or maintain his margin.
The good faith which the law exacts from a pledgee dealing with
a pledge or trust property, upon a default by the pledgor in the
performance of the terms of the contract under which such property
is held, will not permit the pledgee, after having, by its acts or
course of dealings, waived the forfeiture or the right to dispose
of the pledge upon such default by the pledgor, to suddenly stop
short and insist upon the right to dispose of said property, without
notice, because of any such default, when the pledgor is unprepared
to perform said terms.

"3. If the jury believe that the defendant, by any course of
conduct, in their dealings with the plaintiff in the purchase and
carrying of stock upon a margin, waived their right to exact
strict performance of the contract, and gave the plaintiff time
and indulgence in increasing and maintaining his margin, then
the defendants could not recall such waiver at their own option,
without reasonable notice to the plaintiff, so that he might have

an opportunity to protect his stock; nor could the defendants, if they made such waiver, sell the stock of the plaintiff without giving such reasonable notice to him. And if the jury further believe from the evidence that the defendants did make such waiver, and, without giving such notice, did sell the stock of the plaintiff complained of in the declaration, then they must find for the plaintiff, if they believe from the evidence that he has been damaged by such conduct of the defendants.

"4. The jury are also instructed that if they believe that in the conversation between the plaintiff and Roden on July 26, 1910, the said Roden asked the plaintiff to put up additional margin, and the plaintiff replied by asking whether it would not be satisfactory if he would put it up the next day, and, if so, that he would send the said Roden $5,000 the next day, and that to such inquiry the said Roden replied that it would be satisfactory if he would send up that amount the next day, and that Roden had power and authority from the scope of agency to make such promise, and, further, that the plaintiff did send up that amount the next day, then the defendants had no right to sell on July 26th the 500 shares of Atlantic Coast Line and 200 shares of American Car and Foundry, and for any such sale they are liable to the plaintiff for damages, if any, as hereinafter stated.

"5. The court further instructs the jury that, under all circumstances as to the sale of the stock purchased for the plaintiff, an obligation rested upon the defendants to act with entire good faith and to sell the securities for the highest price that they could obtain."

The defendants asked for the instructions hereinafter numbered Nos. 1, 4, 5, 6, 7, 7½, 8, 8–a, 9, 9–a, 10, 11, 12, C, 13, and 14, which are as follows:

"1. The court instructs the jury that if they believe from the evidence in this case that the defendant informed the plaintiff that they required enough money to keep a ten point margin on the Car Foundry stock and the Atlantic Coast Line stock of the plaintiff, and that they reserved the right to sell the same unless said margins were so kept, and that the plaintiff failed to keep said

margins, then the defendants had a right to sell said stocks without further notice to the plaintiff, and the jury must find for the defendants.

"4. The court instructs the jury that before Roden could waive any provisions of the contract between the plaintiff and the defendants, he, Roden, must have had authority to make such a waiver. If there is no proof of authority in Roden to so waive, there must be a verdict for the defendants.

"5. That if the jury believe that the defendants postponed to July 27, 1910, by agreement, the payment of the margin called for on the morning of July 26, 1910, such postponement of the payment of the margin called for did not preclude the defendants from exercising their right to sell the securities of the plaintiff if the securities further declined after such first call, and the fact that such further decline took place on the same day did not affect the right of either party differently than if such decline had taken place the following day or the following week.

"6. The court instructs the jury that before Roden could waive evidence in this case that John H. Lyons, in buying and selling stocks through Miller & Co., as brokers, was doing what is known as 'marginal business,' that is, that he did not pay outright for the stocks which he bought, but put up a margin or portion of the purchase price, and that Miller & Co. furnished the balance of the money with which to purchase the stock, and charged him interest on same, and that he had notice that the defendants, Miller & Co., reserved the right to close the transactions when margins were running out or below a certain amount, without further notice to the said Lyons, and settled with him in accordance with sales made; and if they further believe, at the time—to-wit, on the 26th day of July, 1910—at which the sales of the 500 shares of Atlantic Coast Line and 200 shares of American Car and Foundry stocks were sold, the margin on the stock held by the said Lyons was running out or below a point contemplated by the agreement above referred to, and the said defendants sold the stocks because of the small margin, at the market price then obtaining on the New York Exchange, that they must find for the defendants.

"7. The court instructs the jury that before the plaintiff can

recover in this case the burden of proof rests upon him to show by a preponderance of the evidence that he deposited as margins with said defendants such sums of money or securities as said defendants required of the said plaintiff to protect said defendants against loss on account of the fluctuations in the market as to the stocks being carried by the defendants for the plaintiff on July 26, 1910, or that the plaintiff was then excused or relieved by the defendants from depositing such margins, and that unless the plaintiff does so prove the jury must find for the defendants.

"7½. The court further instructs the jury that if they believe from the evidence in this case that the plaintiff, for a long time before July 26, 1910, had been dealing with the defendants as brokers, and that the said plaintiff had received written statements from the defendants, which provided that 'It is further understood that on all marginal business the right is reserved to close transactions when margins are running out, without further notice'; and if they further believe that, on the morning of July 26, 1910, the defendants notified the plaintiff that the market was declining, and called on him for the sum of $4,000 additional margin, and the plaintiff thereupon promised to pay the $4,000 the next day, and that the defendants promised to give the plaintiff till the next day—to-wit, July 27, 1910—to pay the said $4,000, yet if they further believe that after said promise the market price of all the stocks of the plaintiff referred to in the declaration continued to decline, so that it required an additional margin over and above the aforesaid sum of $4,000 to keep the margin required to protect the plaintiff's stock, and that the plaintiff did not keep in touch with said market, and did not inform the defendants where he could be found or located, and that the defendants made reasonable effort to locate the said plaintiff, so as to give him notice of the further declining condition of the market, and did not find the said plaintiff, and that afterwards, on July 26, 1910, the defendants sold the said 500 shares of Atlantic Coast Line and 200 shares of American Car and Foundry stocks, at a time when the market was further declining and the margins upon all the stock of the plaintiff referred to in the declaration were running out, that then the defendants had a right to sell said stock, without further notice to the plaintiff, and the jury must find for the defendants.

"8. The court further instructs the jury that if they believe from the evidence that there was an agreement between the plaintiff and defendants, through its agent, E. L. Roden, on the 26th day of July, 1910, that the defendants would not carry the stocks through the day without additional margin if the stocks declined, and the stocks did decline, and the plaintiff did not put up additional margin, that then the plaintiff cannot recover any damages, and the jury must find for the defendants.

"8-a. The court instructs the jury that, although they may believe from the evidence in this case that E. L. Roden agreed with the plaintiff to forego the call for margin then necessary at the time the call was made, and if they also further believe that there was a further decline in the market that made it necessary to call for additional margin, and that Roden exercised all diligence in endeavoring to locate the plaintiff so as to apprise him of the fact that there was a further decline and to call upon him for additional margin, and he was unable, by the exercise of such diligence, to find the plaintiff, and that the margins were so running out, and the defendants, acting in good faith, sold out a part of the account of the plaintiffs, that then the jury are instructed they must find for the defendants.

" 9. The court instructs the jury that if they believe from the evidence that when the plaintiff employed the defendants as brokers that the plaintiff contracted with the defendants to deposit with them certain sums of money or securities as a margin above the market price of said stocks so purchased, so as to protect the said defendants against loss on account of fluctuations in the market, then it was and became the duty of the plaintiff, without notice from the defendants, to at all times constantly watch the market, so as to keep enough money or securities deposited with the said defendants to maintain said margin, so as to protect the defendants against loss; and if they believe from the evidence that the said plaintiff failed to do so, and that the defendants sold the stock of the plaintiff set out in the declaration at a time when the plaintiff did not have enough money deposited with the defendants to maintain and keep said margin, then they must find for the defendants.

"9-a. The court instructs the jury that if they believe that the

plaintiff was illegally sold out, that then it was the duty of the plaintiff to require the brokers to replace the stock at the earliest moment, and, if they failed to do so, then to purchase the same himself, the court telling the jury that the party who suffers from a breach of a contract must so act as to make his damages as small as he reasonably can.

"10. The court tells the jury that if they believe from the evidence that the plaintiff was illegally sold out, that the law allows him just indemnity for the loss that he has sustained by the sale of his stock, and, in case where loss of profits is claimed, it should be an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable, and proximate result of the wrongful act complained of, and which a proper degree of prudence on the part of the plaintiff would not have averted, that it was the duty of the plaintiff, so soon as he learned that he was sold out, to require the defendants to re-instate him, and, if they failed to do so within a reasonable time, then to purchase for himself, the court telling the jury that the party who suffers from a breach of contract must so act as to make his damages as small as he reasonably can.

"11. The court instructs the jury that if they believe from the evidence that the plaintiff was illegally sold out, and damaged thereby, that then the measure of his damages is the difference between the price at which the plaintiff was illegally sold out and the price at which the said stocks which were so sold could have been repurchased within a reasonable time, and that the next day, the 27th day of July, 1910, was a reasonable time for the plaintiff to repurchase said stock, under the facts and circumstances of this case, and that in ascertaining the damages, if any, to which they may find the plaintiff to be entitled, they cannot allow the plaintiff more than the difference between the price at which the 500 shares of Atlantic Coast Line and 200 shares of American Car and Foundry stock was sold on the 26th day of July, 1910, and the market price at which the plaintiff could have repurchased the same on July 27, 1910.

"12. The court instructs the jury that the burden of proof in this case is upon the plaintiff to prove, by a preponderance of evidence, to the satisfaction of the jury, all the material allega-

tions of his declaration, and also to prove, by like evidence, that there was a waiver by the defendants of their agreement, or that a new contract was made by him with the defendants on July 26, 1910, and that said Roden had power and authority from Miller & Co. to make such a promise, if any such was made.

"No. C. The court instructs the jury that it is for them to determine what the agreement was between Mr. Roden and the plaintiff on the 26th day of July, 1910, and whether or not Miller & Co., through Mr. Roden, agreed to carry the plaintiff's account over until the next day, regardless of the condition of the market. They are further instructed that if they believe from the evidence in this case that there was an agreement on the part of Miller & Co. to so carry the plaintiff's account over until the next day, then this became a new contract, and the question as to whether or not the defendants, by their course of conduct and previous dealing, had waived a strict compliance with the original contract cannot be taken into consideration, but that this new agreement superseded both the original contract and the previous course of dealing.

"13. The court tells the jury that waiver is the intentional relinquishment of a known right, with both knowledge of its existence and an intention to relinquish it; and that if the plaintiff claims that the defendant waived any of the conditions of the contract of pledge, or that they waived the right to a ten point margin, the burden of proof is upon the plaintiff to prove, by a preponderance of evidence, such waiver, and to prove the intent on the part of the defendant to make such waiver.

"14. The court instructs the jury that where a person deals with an agent it is his duty to ascertain the extent of the agency, and that he deals with him at his own risk; and they are further instructed that it is for them to determine from the facts in this case whether or not the agent, E. L. Roden, had the power to waive the provisions of the contract requiring the plaintiff to keep a margin of ten points on his stock; and they are further instructed that the contract in this case was that the plaintiff should keep at all times a margin of ten points on the amount of his purchases, and that if the plaintiff seeks to excuse himself from performing the contract he must show, by a preponderance of the testimony,

that he did so keep his account, or that the defendants themselves waived this contract, or that an agent who had authority to waive said contract did so waive the provisions thereof."

But the court refused to give instructions asked for by the defendants Nos. 1, 4, 5, 7½, and C, and modified and amended the defendants' aforesaid instructions Nos. 6, 7, 9, 11, and 13, and as modified and amended gave them as follows (the amendments being italicized):

"No. 6. The court instructs the jury that if they believe from the evidence in this case that John H. Lyons, in buying and selling stocks through Miller & Co., as brokers, was doing what is known as a marginal business, that is, that he did not pay outright for the stocks which he bought, but put up a margin or portion of the purchase price, and that Miller & Co. furnished the balance of the money with which to purchase the stock, and charged him interest on same, and that he had notice that the defendants, Miller & Co., reserved the right to close the transactions when the margins were running out or below a certain amount, without further notice to the said Lyons, and settle with him in accordance with sales made; and if they further believe, at the time—to-wit, on the 26th day of July, 1910—at which the sales of the 500 shares of Atlantic Coast Line and 200 shares of American Car and Foundry stocks were sold, the margin on the stock held by said Lyons was running out or below a point contemplated by the agreement above referred to, and the said defendants sold the stocks, because of the small margin, at the market price then obtaining on the New York Exchange, that they must find for the defendants, *unless the jury shall believe from the evidence that the defendants, by their course of action, waived such right to sell without notice, or do not believe from the evidence that on July 26th the defendants agreed with the plaintiff that they would wait until the next day for additional margins.*

"No. 7. The court instructs the jury that before the plaintiff can recover in this case the burden of proof rests upon him to show, by a preponderance of the evidence, that he deposited as margins with said defendants such sums of money or securities

as said defendants required of the said plaintiff to protect said defendants against loss on account of the fluctuations in the market as to the stocks being carried by the defendants for the plaintiff on July 26, 1910, or that the plaintiff was then *or had previously been* excused or relieved by the defendants from depositing such margins, and that unless the plaintiff does so prove the jury must find for the defendants.

"9. The court instructs the jury that if they believe from the evidence that when the plaintiff employed the defendants as brokers that the plaintiff contracted *by the terms of the agreement between them* with the defendants to deposit with them certain sums of money or securities as a margin above the market price of said stocks so purchased, *and to maintain the same at all times,* so as to protect the said defendants against loss on account of the fluctuations in the market, then it was and became the duty of the plaintiff, without notice from the defendants, to at all times constantly watch the market, so as to keep enough money or securities deposited with the said defendants to maintain said margins, so as to protect the defendants against loss, *unless the terms of said contract were waived by the defendants as explained in the other instructions;* and if they believe from the evidence that the said plaintiff failed to do so, *that the defendants had not waived the terms of their agreement as explained in another instruction,* and that the defendants sold the stock of the plaintiff set out in the declaration, at a time when the plaintiff did not have enough money deposited with the defendants to maintain and keep said margin, then they must find for the defendants, *provided you do not believe from the evidence that on July 26 the defendants agreed with the plaintiff that they would wait until next day for additional margins.*

"11. The court instructs the jury that if they believe from the evidence that the plaintiff was illegally sold out, and damaged thereby, that then the measure of his damages is the difference between the price at which the plaintiff was illegally sold out and the price at which the said stocks which were so sold could have been repurchased within a reasonable time, and that the 16th day of August, 1910, was a reasonable time for the plaintiff to repurchase said stock, under the facts and circumstances of this

case, and that in ascertaining the damages, if any, which they may find the plaintiff to be entitled, they cannot allow the plaintiff more than the difference between the price at which the 500 shares of Atlantic Coast Line and 200 shares of American Car and Foundry stock was sold on the 26th day of July, 1910, and the market price at which the plaintiff could have repurchased the same on the 16th day of August, 1910.

"No. 13. The court tells the jury that waiver is the intentional relinquishment of a known right, with both knowledge of its existence and an intention to relinquish it. And if the plaintiff claims that the defendants waived any of the conditions of the contract of pledge, or that they waived the right to a ten point margin, the burden of proof is upon the plaintiff to prove, by a preponderance of evidence, such waiver, and to prove the intent on the part of the defendant to make such waiver. *Waiver need not be proved by express statement to that effect. It may be proved by the acts, conduct, or dealings of the defendants.*"

The opinion states the case.

*O'Flaherty & Fulton, Scott, Buchanan & Cardwell,* and *Simpson, Werner & Cardozo,* for the plaintiffs in error.

*Page & Leary* and *Meredith & Cocke,* for the defendant in error.

Keith, P., delivered the opinion of the court.

Lyons brought an action of assumpsit in the Circuit Court of the city of Richmond against the firm of Miller & Co., stock brokers of the city of New York, with a branch office in the city of Richmond, and recovered a verdict and judgment for $7,145, to which Miller & Co. applied for and obtained a writ of error.

During the progress of the trial several bills of exceptions were taken to the admission of evidence, but as they present no question of particular interest, and were, we think, correctly decided, they need not be further noticed in this opinion.

The testimony and other evidence before the jury tends to

prove that Lyons, during a series of years, commencing in 1906 and coming down to July, 1910, was the purchaser of stocks through the firm of Miller & Co. upon margins. The nature of the contract between Miller & Co. and Lyons is disclosed by the statements and receipts given by Miller & Co. to Lyons upon the purchase or sale of stocks or the receipt of money paid by Lyons to Miller & Co., as, for example, upon the purchase of stocks, Miller & Co. would issue to Lyons a receipt in the following form, printed in red ink:

"The amounts of securities specified in this receipt are deposited with Miller & Co., and are to be used by them as margin or collateral security to protect them from loss in any present or subsequent transaction between them and the party to whom it is issued. If the said Miller & Co. shall at any time, for any reason, deem the said margin insufficient, then the said Miller & Co. may close any or all of such transactions without demanding further payment or additional security, and may buy in or sell any stocks, bonds, securities, grain, provisions, or other property sold or purchased for the party to whom this receipt is issued, and may sell any securities held as collateral, on the New York Stock Exchange, New York Produce Exchange, New York Cotton Exchange, New York Coffee Exchange, Chicago Board of Trade, or elsewhere, at public or private sale, without demand or notice."

And on each transaction where there was a purchase or a sale made a notice of the same was sent, at the bottom of which was printed plainly the following:

"It is understood that on all marginal business we reserve the right to close transactions for your account, without further notice, whenever your margins are running out, and to settle contracts in accordance with the rules and customs of the New York Stock Exchange."

It is admitted by both parties, plaintiff and defendants, that such was the contract between them.

The business between the plaintiff and the defendants was carried on through Mr. Roden, the agent of Miller & Co. in charge of the Richmond office, and on the 26th of July, 1910, Lyons was the holder of 1,100 shares of Atlantic Coast Line stock

and 500 shares of American Car and Foundry stock, and, measured by the opening prices of those stocks upon the morning of that day, his account was $4,000 less than a ten *per cent.* margin; thereupon Mr. Roden called Mr. Lyons over the 'phone about half past ten o'clock, but Mr. Lyons was not at that time in his office. He again called about a quarter past eleven o'clock, and when Mr. Lyons came to the 'phone, Roden, according to his statement, told him that his account required $4,000 additional margin, to which Mr. Lyons responded: "I have just gotten to the office; I have got a great big pile of mail in front of me; I am very busy; I won't have time to attend to it to-day; won't it be satisfactory to send it up to-morrow?"; to which Roden (according to Roden's account) replied that it would be satisfactory to send it "to-morrow, *if the market did not decline further.*" Lyons replied: "I haven't got time to attend to it to-day, but I will certainly send it up in the morning." Roden said: "All right, Mr. Lyons," and that was all. An hour later the market had declined. Coast Line had opened at 107 and Car Foundry at 44; Coast Line sold off to 106 and Car Foundry to about 42, and whereas Mr. Lyons's account had required $4,000 at the opening, this decline of a point in Coast Line and two points in Car Foundry made it necessary to have about $3,000 more. Roden testified: "I had not any doubt in the world but what I could get hold of Mr. Lyons, and I went to the 'phone about twelve o'clock, when Coast Line was selling at a still lower price, about 104, called up his office, and I was told that he had gone home. Then I went back to the desk and penciled a note to Mr. Lyons; I wrote him a note, and told him the market had declined further, and we must have five thousand dollars at once, or we would have to liquidate part of his account. I called my young man, Mr. Hotze, and gave him this note. He read it, and I put it in an envelope and addressed it to Mr. John H. Lyons, care Richmond Leather Company, and told Mr. Hotze to take it down there and give it to Mr. Lyons, and if he was not there to leave it. After he had gone I went to the 'phone and called up Mr. Lyons's home. I was told that he was not there. I thought perhaps Mr. Lyons had not had time to get home. So, in the meantime, Mr. Hotze got back and said that Mr. Lyons was not there at his office, but he had left

the note. I again called up his home, but he was not there. I left word with whoever answered the 'phone to have Mr. Lyons call my 'phone, Monroe 601, as soon as he got there." He then called up the Commonwealth Club, of which Mr. Lyons was a member, and was told that Mr. Lyons had just left. Then he informed the New York office that he could not locate Mr. Lyons anywhere; that he had called Mr. Lyons in the morning, and told him that they must have this $4,000 margin, and informed the New York office of what had taken place between them. Later in the day the decline was so constant and of such a general character, and the market in such a precarious condition, that Miller & Co., acting upon the authority which they had under the contract, and according to their best judgment, closed out a portion of the plaintiff's account, and sold 500 shares of Coast Line and 200 shares of Car Foundry at the best bids which they could get, selling them in lots of 100, and members of the firm personally executing the sales of the stock upon the New York Exchange. Miller & Co. assert that these sales were made in good faith and in the exercise of their best business judgment, for the protection of both parties, and in accordance with the terms of the contract had with the plaintiff, after he had violated his contract and failed to keep up his margins.

On the next day Lyons wrote a letter to Miller & Co. and sent a check for $5,000, demanding that he be reinstated. In this letter he claimed that the agreement between himself and Roden was that it would be satisfactory if a check for $5,000 was sent the next day; Roden claiming that the agreement was that it would be satisfactory provided the market did not decline.

It may be as well to give here Lyons's statement of what occurred on the 26th of July.

He said he had just gotten to his office when he was told that Mr. Roden was at the 'phone and wished to speak to him; that Mr. Roden said: "Mr. Lyons, the market looks very weak, and I must have $5,000 to-day." Mr. Lyons states: "I took my watch out and said, 'Gee, Mr. Roden'—that is the way I know it was 11:15, I took out my watch and looked at it, and said, 'Gee, Mr. Roden, it is 11:15, and I have just this minute gotten to my office'— I don't think I had taken my coat off; 'can't you wait until

to-morrow?' He said, 'Mr. Lyons, will you certainly attend to it to-morow?' I said, 'I certainly will.' He said, 'Don't fail,' and he repeated it again. I said, 'Mr. Roden, I will certainly attend to it the first thing in the morning.' He said, 'All right, that will do.' I said, 'I thank you very much, Mr. Roden; I am very much obliged to you.'"

It will be observed that this differs from Roden's account in two particulars: In the first place, Roden claims to have asked for $4,000, while Lyons says the demand was for $5,000—but this difference is not material; and, according to Mr. Roden's account, his promise was conditional—that it would be satisfactory to have the money the following day, *if the market did not decline further*, whereas, according to the statement of Mr. Lyons, the undertaking was unconditional.

Mr. Lyons's statement is corroborated by his book-keeper— that is to say, corroborated so far as a conversation can be corroborated by a witness who hears only one of the interlocutors.

The case for the defendant in error rests upon two propositions—first, that Miller & Co. did not have a right to sell his stocks, or any of them, without notice, as was done on July 26, 1910, after having, by their acts, and by the course of dealings between themselves and him, covering a period of four years, led him to believe that a sale would not be made without an opportunity being given him to increase and maintain his margin; second, that he made with Miller & Co., on the morning of July 26, 1910, a valid contract, whereby Miller & Co. bound themselves unconditionally to wait until the following day for the margin called for, and therefore they (Miller & Co.) did not have the right to sell his stocks, nor any part of them, on that day.

These two defenses are by no means contradictory the one of the other, or even in any degree inconsistent. Either one of them would be sufficient if maintained by satisfactory proof, or both of them together may be relied upon by the plaintiff to maintain his suit.

That covenants and stipulations made by a covenantor for his benefit may be waived by him, either by express terms or by a course of dealing, is a well-established principle in every system

of enlightened jurisprudence. That a covenantor may, by his conduct, so lull his covenantee into a sense of security as thereby to estop himself from the exercise of a right for which he had contracted is equally clear. Instances illustrating this principle abound in the law with reference to contracts of insurance, but its operation is not limited to any specific class of contracts and dealings between men. Such estoppels are founded upon principles of morality and public policy, their object being to prevent that which deals in duplicity and inconsistency. *Bower* v. *McCormick*, 23 Gratt. (64 Va.) 310.

In *Georgia Home Ins. Co.* v. *Kinnier's Adm'x*, 28 Gratt. (69 Va.) 88, it was held that "Any acts, declarations, or course of dealing by the insurers, with knowledge of the facts constituting a breach of a condition in the policy, recognizing and treating the policy as still in force, and leading the assured to regard himself as still protected thereby, will amount to a waiver of the forfeiture by reason of such breach, and estop the company from setting up the same as a defense when sued for a subsequent loss."

In the case before us, under the contract between the parties, it may be conceded that Miller & Co. had the right to sell the stocks carried by them for Lyons whenever his margin fell below ten points, and that they were the sole judges of the necessity and propriety of sale; yet, applying the principle declared by Judge Burks in the case just cited, any acts, declarations, or course of dealing upon the part of Miller & Co., with knowledge of the facts, and which led Lyons to believe that they would not exercise their right to sell without giving him timely notice, estops them from setting up their right to sell under the contract, when sued for a loss incurred by reason of a sale made in derogation of such course of dealing.

That the evidence in the record does tend to establish such a course of dealing as tended to lull Lyons into a false sense of security, and such as to induce a reasonable man to believe that the power of sale would not be exercised without an opportunity upon his part to put up additional margin, is plain. Running through the whole course of their transactions, covering about four years, there were many instances in which Lyons's margin fell below ten *per cent.*

On May 28, 1907, they had demanded $1,000 margin, and he had sent $500, and thereupon they wrote to him as follows: "In response to our request for $1,000 margin you sent us to-day $500.   In the present state of the market it is very necessary that we should have full margin on all accounts, and we would, therefore, thank you to let us have to-morrow $500 additional, in accordance with our original request."

On August 9, 1907, they wrote to him: "In the absence of additional funds, as requested by us several times, we have placed an order to sell your Atlantic Coast Line, when present margin is exhausted, at 82¾."

On August 10, 1907, they wrote: "We have wired you to-day at Woodberry Forest requesting fifteen hundred dollars more on your Atlantic Coast Line stock.   Our New York office informs us that they have, in the meantime, entered a stop loss order at 74⅝.   The stock closed at 79."

October 7, 1907: "Atlantic Coast Line is selling now at 77. Your account requires $1,000 additional amount early to-morrow. We were unable to get you on the 'phone to-day."

October 9, 1907: "We have no response to our request made on Monday, the 7th instant, for additional margin.   Unless you attend to this matter at once we will have to close the account out when present margins are exhausted."

October 10, 1907:   "We beg to acknowledge $1,000 received to-day.   Same has been credited to your account.   Coast Line broke again, selling at 71¼.   The account now requires $1,000 in addition to the $1,000 above named.   Please see that we receive check for this amount to-morrow."

October 11, 1907:   "Coast Line closed at 70 to-day.   We have been trying all day to get you over the 'phone.   So far we have been unable to reach you.   We must have $1,500 additional margin on your stock before 11 o'clock to-morrow morning;   if it is not received we will have to enter an order to close the account when present margins are exhausted."

October 26, 1909:   "We wired you to New York, requesting you to let us have $1,000 additional margin, and also requesting you to reply to our telegram.   At this writing we have not received a reply, although we are informed by the Telegraph Com-

pany that our message was delivered to you in person. We must have this check Monday morning, otherwise we will have to enter an order to sell your stocks when present margins are exhausted."

We think these letters justify the comment made upon them in the brief of defendant in error: They show "the demands for margins when required to be paid and notice of Miller & Co.'s intention to close out account on stop loss order, or 'when the margins are exhausted.' They show that the fact that they could not get him over the 'phone did not lead them to believe that they were justified in selling without giving Lyons until the next day to put up more margins. They afford a fair sample of Miller & Co.'s course of dealings with Lyons throughout the entire term covered by the account."

In the instances cited, and in many others that appear in the record, it seems that although the market might be weak and falling, although the margin had fallen below the ten *per cent.* limit, although the demands for margins were not always promptly met, that Miller & Co. never went beyond the point of reiterating the demand for margins, with the declaration in some instances that they had put in a stop loss order—in other words, that the stock would be sold when the existing margin was exhausted.

Upon this evidence, the court instructed the jury as to the rights of plaintiffs in error under the original contract, unmodified and unaffected by the course of dealing between the parties; it then instructed the jury as to waiver of the right by express agreement or by a course of dealing between the parties; and those instructions we think fully and fairly submitted the question to the jury.

There is, in our opinion, no conflict between instructions Nos. 3 and 4, given by the court at the instance of the defendant in error. In No. 3 the jury is instructed as to the effect of the general course of dealings between the plaintiff and the defendants, as to the purchase and carrying of stocks upon margin, and in instruction No. 4 the attention of the jury was directed to what occurred between Lyons and Roden on the 26th of July, 1910. As we have seen, the plaintiff relied upon two theories to maintain his case— the general course of dealing between the parties, and the specific

contract of July 26, 1910. The law, as applicable to the two branches of the case, is presented in instructions 3 and 4, and we find in them no insufficiency, no inconsistency, but are of opinion that they fairly and properly present the law of the case upon the points covered by them.

A great deal of reliance was placed by counsel for plaintiffs in error upon instruction "C," which was offered by them and refused by the court. What we have already said disposes of this question. The plaintiff could properly advance both theories of his case before the jury, introduce evidence in support of each, and ask the court to instruct with respect to them; and the assertion of defendant in error's right, under the arrangement of July 26, 1910, did not, in our judgment, involve an abandonment, or in any degree diminish his right to rely upon the course of dealing which had prevailed between the parties up to that time.

The real source of trouble in this case was that Miller & Co., the principals, disapproved of and repudiated the act of their agent, Roden, when he advised them of what he had done. This view is strongly supported by a letter from Roden, on the evening of July 26, 1910, to Mr. Lyons, in which he says: "After my talk with you on the 'phone to-day the market broke very badly, and additional margins were demanded on your account. I called your office and sent down there, but you were gone. I tried your house and the club, at neither of which places could you be had. I left word at each place for you to call me up, and have not yet heard anything from you. No answer being obtainable, our New York office gave orders to liquidate part of your account, which was done by selling 200 Car Foundry and 500 Coast Line. They positively declined to carry the account over night without additional margin, and I was unable to supply it, being unable to locate you."

Mr. Lyons, upon returning to his office the following morning, called Roden up over the 'phone, and said: "Mr. Roden, I am very much surprised to receive this letter. I am utterly astonished; what is the meaning of it?" His reply was: "Mr. Lyons, I did not do it; New York did it. I am just as sorry as you are." Mr. Lyons then said to Roden: "Mr. Roden, I promised to send you $5,000 up this morning, and I am going to do it. I am going

to send it right this minute. I am living up to my contract. You made a direct contract with me, and I am living up to my contract, and I expect you to live up to yours." That check was sent. There is no reason to believe that it could not and would not have been sent the day before if it had been insisted upon.

But, it is said, if it had been sent the day before, the course of the market during the day had still reduced the margin below 10 *per cent.*, and that the cash, if paid the day before, would certainly have been as good as the promise to pay the following day; all of which is very true, if that were a complete statement of the contract or agreement or arrangement of July 26, and just there comes in the importance of the difference which exists in the accounts of what took place between Mr. Roden and Mr. Lyons. According to Mr. Lyons (and his view seems to have been accepted by the jury) there was an unconditional promise to wait until the next day, the effect of which was to relieve Lyons of all apprehension during the intermediate period. It was in accordance with the course of dealing which had theretofore prevailed between the parties, and he went to his home in the full security that he would have nothing to apprehend until the following day.

The instructions are predicated upon facts which the evidence tends to establish, they present familiar principles of the law of waiver and of equitable estoppel, and we shall content ourselves by saying that the law covering the case was properly put before the jury.

So much for the defendant in error's right to recover.

The next question which arises is as to the measure of damages.

Plaintiffs in error contend that it was the duty of the defendant in error, if he was injured and had sustained damage by reason of the conduct of plaintiffs in error, to minimize the damage and to diminish the plaintiff in error's loss by reasonable diligence upon his part—that is to say, that Lyons ought at once to have repurchased the stock, and that he is only entitled to recover the difference between the price it brought when sold by Miller & Co. and what it would have cost him to recover his position by a repurchase of the stock at a subsequent day.

Lyons promptly notified Miller & Co. that he considered he had been wronged by them, that he demanded restoration to

the position which he occupied by a repurchase by them of the stock which they had sold. They were the wrong-doers, and not Lyons. Surely it was as incumbent upon them, in their own interest, to diminish the loss occasioned by their wrongful act, which they could have done had they promptly acceded to Lyons's demand, as it was upon Lyons to diminish the consequences of their wrongful act by himself going into the market and buying back an equivalent amount of the stocks which they had sold.

When the question as to the measure of damages was considered by the circuit court, the contention was made by plaintiffs in error that it was for the court to determine at what day the price of stocks was to be ascertained, and adopted by the jury, and, on the other hand, it was contended by the defendant in error that it was for the jury to determine that question. The court decided the contention in accordance with the views of plaintiffs in error, and determined that the price of the stocks on the 16th of August, 1910, just twenty-one days after the sale, was the proper time at which to ascertain the price of the stocks, in order to determine the *quantum* of damages, with the result that the jury found a verdict for the plaintiff for the amount already stated.

We know of no case in the reports of this court which throws any light upon this question, but it has frequently been before the courts of New York.

In the cases of *Romaine* v. *Van Allen*, 26 N. Y. 309, and *Markham* v. *Jaudon*, 41 N. Y. 235, it was laid down as a rule, and a recovery was permitted which gave the plaintiff the highest price of the stock between conversion and the trial, which principle, if adopted in this case, would have resulted in a very much larger verdict than that which was given.

In *Baker* v. *Drake*, 66 N. Y. 518, 23 Am. Rep. 80, however, those cases were overruled, and it was said: "The advance in the market price of the stock from the sale up to a reasonable time to replace it, after the plaintiff received notice of the sale, would afford a complete indemnity."

Lyons, thinking, with reason, that he who had committed the wrong should right it, demanded, as we have seen, on the 27th of July, that Miller & Co. should repurchase the stocks which they had sold, and that demand was insisted upon by him,

and was never finally rejected by Miller & Co. until he received their letter of August 10th. After Lyons ascertained that Miller & Co. would not yield to his demand, we think he was entitled to a reasonable opportunity to consult counsel, to employ other brokers, and to watch the market for the purpose of determining whether it was advisable to purchase on a particular day, or when the stock reached a particular quotation, and to raise funds if he determined to repurchase.

In the case of *Burnhorn* v. *Lockwood*, 71 App. Div. (N. Y.) 301, 75 N. Y. Supp. 828, the court said: "The respondent resided in the city of New York, and was here at the time. No other facts or circumstances were shown which aid in the determination of the question. In the absence of evidence of special circumstances showing other elements of necessity for further time, we think it may be stated, as a general rule, that the customer is entitled to a reasonable opportunity to consult counsel, to employ other brokers, and to watch the market for the purpose of determining whether it is advisable to purchase on a particular day, or when the stock reaches a particular quotation, and to raise funds if he decides to repurchase." In that case the record showed that the conversion occurred on May 13, and the court ruled that the plaintiff was entitled to the highest price at which the stock sold prior to June 12th. Thirty days, therefore, was the time allowed in that case.

In *Colt* v. *Owens*, 90 N. Y. 368, thirty days were allowed as a reasonable time.

In *Randolph* v. *Albany City Bank*, 1 N. Y. St. Rep. 592, it was held that the reasonable time elapsed before the expiration of six months, and that the question depends upon the circumstances of each case.

In *Wright* v. *Bank of Metropolis*, 110 N. Y. 237, 18 N. E. 79, 1 L. R. A. 289, 6 Am. St. Rep. 356, it was held, upon the facts of that case, that a reasonable time expired July 1st following the 9th day of May of the same year, which was nearly two months.

Every case seems to depend in this respect upon its own facts. Lyons had been dealing with Miller & Co. through a long period, through their accredited agent, Roden. Those dealings,

while directly with Roden, appear always to have been communicated to and approved by his principals. By that course of dealing Lyons had been led to believe that a sale would not be made without giving him due notice. A sale was made, and he felt himself aggrieved. He immediately demanded reparation, and, after a considerable period spent in negotiation, his demand was refused. Taking all the circumstances into consideration, we are unable to say that the court erred to the prejudice of plaintiffs in error in fixing upon August 16th as the date at which the value of the stocks was to be estimated in order to give to Lyons that indemnity to which he was entitled.

We shall conclude this branch of the case by citing *Galigher* v. *Jones*, 129 U. S. 193, 32 L. Ed. 658, 9 Sup. Ct. 335. Speaking of the unlawful conversion of stocks, and the time at which their value should be ascertained in order to give the party injured a satisfactory indemnity for the wrong done him, Mr. Justice Bradley, delivering the opinion of the court, said: "Perhaps more transactions of this kind arise in the State of New York than in all other parts of the country. The rule of highest intermediate value up to the time of trial formerly prevailed in that State, and may be found laid down in *Romaine* v. *Van Allen*, 26 N. Y. 309, and *Markham* v. *Jaudon*, 41 N. Y. 235, and other cases, although the rigid application of the rule was deprecated by the New York Superior Court in an able opinion of Judge Duer, in *Suydam* v. *Jenkins*, 3 Sandford (N. Y.) 614. The hardship which arose from estimating the damages by the highest price up to the time of trial, which might be years after the transaction occurred, was often so great that the Court of Appeals of New York was constrained to introduce a material modification in the form of the rule, and to hold the true and just measure of damages in these cases to be the highest intermediate value of the stock between the time of its conversion and a reasonable time after the owner has received notice of it to enable him to replace the stock. This modification of the rule was very ably enforced in an opinion of the Court of Appeals delivered by Judge Rapallo in the case of *Baker* v. *Drake*, 53 N. Y. 211 [13 Am. Rep. 507], which was subsequently followed in the same case in 66 N. Y. 518 [23 Am. Rep. 801], and in *Gruman* v. *Smith*, 81 N. Y. 25; *Colt* v. *Owens*, 90 N. Y.

38

368, and *Wright* v. *Bank of Metropolis,* 110 N. Y. 237, [18 N. E. 79, 1 L. R. A. 289, 6 Am. St. Rep. 356]." See also *Mullen* v. *Quinlan,* 195 N. Y. 109.

In that case (*Galigher* v. *Jones*) it appears that the stock was sold on the 27th and 29th of November, 1878, at $1.25 per share; "that in December the stock sold as high as $2.00 per share; in January the highest price was $3.10; in February the highest price was $5.50. The referee allowed the defendant the highest price in January, namely, $3.10 per share, being an advance of $1.85 above what the plaintiff sold the stock for, which, for the whole 600 shares, amounted to $1,110. The reason assigned by the referee for not allowing the defendant the highest price in February (namely, $5.50 per share) was that before that time the defendant had reasonable time, after receiving notice of the sale of his stock by the plaintiff, to replace it by the purchase of new stock, if he desired so to do; and he allowed him the highest price which the stock reached within that reasonable time. In this conclusion we think the referee was correct, and as to this item we see no error in the result." It appears, therefore, that in that case the court approved a delay of more than two months.

Upon the whole case, we are of opinion that the case was properly submitted to the jury, that the facts warranted the verdict, that there is no error in the judgment, and that it should be affirmed.

*Affirmed.*