[No. 21615. Department Two. October 19, 1929.]

JOHN S. HUDSON, INCORPORATED, *Respondent and Cross-Appellant*, v. POWER PLANT ENGINEERING COMPANY, *Appellant*.[1]

*Poe, Falknor, Falknor & Emory,* for appellant.
*Karr & Gregory* and *George F. Hannan,* for respondent.

MILLARD, J.—This action was instituted for the return of the purchase price of a refrigerating system installed in the apartment house of the plaintiff under a contract in which was reserved to the buyer the power of cancellation of the contract if dissatisfied with the plant. Defendant's demurrer was overruled. The cause was tried to the court, resulting in findings, conclusions and judgment in favor of the plaintiff for

[1]Reported in 281 Pac. 324.

twenty-four hundred dollars. For the sake of brevity, both parties having appealed from that judgment, the plaintiff will be referred to as respondent and the defendant as appellant.

On February 2, 1925, the appellant contracted with the respondent for the installation of a Serv-El refrigerating system in the Northcliffe apartments in Seattle, owned by the latter and then in course of construction. Respondent paid $6,724.34 for the system, the installation of which was concluded some time in July or August, 1925. As provided by the contract, payments were made weekly on a basis of eighty per cent of the material and labor expended on the installation as it progressed, and the final payment was made on or about August 31, 1925. Some time in August, 1925, a preliminary inspection and test of the system were made by appellant's superintendent and president. Following that inspection, the respondent's president, Mr. Hudson, accompanied the two officials of the appellant and made a final inspection of the plant.

Witnesses testified that each apartment was visited and that the refrigerating box in each apartment was frosted over and in many were ice cubes; that the day's temperature was about ninety degrees and the sun's rays were streaming into the empty rooms, yet each box was refrigerated and the machines were functioning. Mr. Hudson testified that he did not go over the entire building before he made the final payment; that "I went in one or two apartments, perhaps, and then paid him the twenty per cent" final payment. Appellant serviced the system from the conclusion of installation in July or August, 1925, until the latter part of March, 1927. Under the terms of the contract, that service was rendered for one year without charge. When the period for free servicing expired, the appellant continued to service the system until March, 1927,

the charges for which were paid by the respondent, who did not question the amount of the charges, nor was any dissatisfaction with the plant expressed. In March, 1927, the Serv-El Corporation canceled the appellant's contract of agency, thereby preventing the appellant from purchasing Serv-El parts or servicing Serv-El refrigerating plants. That corporation had a factory branch in Seattle, which commenced, in March, 1927, to service respondent's refrigerating system. In November, 1927, appellant, upon the request of respondent, sent a service man (who was accompanied by appellant's president) to the Northcliffe apartments.

Appellant's witnesses testified that they found the refrigerating plant not operating. Only one compressor was running. The automatic water valves which controlled the condensing of the gas to a liquid had been removed from the top. The control dials and the mercury tubes had been taken off of the machines and placed partially in front of the machines near the boiler. The system could not possibly be operated in that way. If the pressure arose, indicating a higher temperature, the automatic water valve would open more and let more water go through and cool the condensers. The appellant did not have anything to do with the removal of the control or the adjustment of the machines the way in which they were found November, 1927. That appellant's employees did not make the change, we are convinced by our examination of the testimony. Respondent's president admitted that some change was made by the Serv-El Corporation when it was servicing the system subsequent to discontinuance of the servicing by appellant in March, 1927; he testified:

"In March, 1927, he told me he could not longer service me. He said we would have to get service from the

Serv-El people. They had a concern here that I sought advice from. I know they made a change up at my plant. I don't know as they took off anything, but they added two or three dials of some sort, looked like pressure gauges of some sort. I don't know what they did to it. They did something to it. I don't know of a single feature of this refrigerating plant that was not in accordance with the specifications."

The respondent was advised that the appellant could not obtain parts from the Serv-El Corporation, which was in the hands of a receiver, and with which company the appellant had not been connected since March, 1927. However, the respondent was informed that valves of a different type could be secured that would function in the same way as the Serv-El valves, and appellant would install them for one hundred dollars. The respondent would not consent to that installation. Respondent then consulted a refrigeration engineer, who reported that the plant was insufficient, that the system would not furnish the refrigeration and that it would cost twenty-four hundred dollars to place the plant in condition where it would function. Two other experts consulted by respondent concurred in that opinion. The respondent then installed a new and different plant at a cost of thirty-six hundred dollars, placed the Serv-El plant in the basement of the Northcliffe Apartments, and on February 21, 1928, commenced this action to recover the contract price of $6,-724.34 paid to the appellant for the Serv-El system.

Summarized, the findings of fact are that the refrigerating system never functioned as agreed between the parties, and that the respondent is entitled to recover twenty-four hundred dollars, the amount that the refrigerating engineer estimated would be required to place the plant in condition where it would comply with the warranties made in the contract. The trial court expressed the view that the respondent knew,

or should have known, that the plant was not meeting its full requirements long before the lapse of two years during which the system was used; that the contract does not give to the respondent a protracted, indefinite or continuous right to rescind; and that there is no evidence of any loss of rental or evidence of any tenant canceling his lease, or that any one refused to rent an apartment because of the failure of the system to function.

The appellant contends that the action should have been dismissed because of the laches of the respondent. The respondent, who cross-appealed, insists that, under the terms of the contract the judgment should have been in its favor for $6,724.34, the contract price of the Serv-El system installed by appellant, and not for $2,400 damages.

The provision of the contract upon which respondent relies reads as follows:

"It is understood that *when this plant is installed and evidence is such that John S. Hudson has reasonable grounds not to be satisfied with the plant as a refrigerating system, and is satisfied that such a plant will not be satisfactory,* he has a right to cancel this contract and any money paid by him to the Power Plant Engineering Co. will be refunded to him, and this contract will be null and void. It is understood that he alone will be the sole judge of the performance of this refrigerating plant."

It is respondent's position that all that it sought is to exercise the reserved power of cancellation of the contract in the event of dissatisfaction with the system and obtain the return of the contract price. A buyer may reserve in his contract the right to rescind the contract, and provide that the purchase price be refunded if the subject-matter of the agreement prove unsatisfactory to the buyer. *Tatum v. Geist,* 46 Wash. 226, 89 Pac. 547.

"It is competent for contracting parties to provide in their agreement that one of them shall be entitled to rescind or terminate the contract if the performance by the other of his obligations under the contract shall prove 'unsatisfactory,' or if the one party shall be 'dissatisfied' with the manner in which the other carries out the agreement:" Black on Rescission and Cancellation (2d ed.), p. 520.

■ The contract is silent as to the time within which dissatisfaction shall be expressed. Respondent argues that the provision quoted above contemplated a fair test of the plant, not only that respondent may ascertain that the plant is not actually satisfactory, but also that the respondent may become *"satisfied that such a plant will not be satisfactory;"* that respondent could not act arbitrarily. Respondent could not demand a return of its money for defects which might be remedied; it must give the plant a good chance and must have information from which Hudson, Inc., could reasonably be *"satisfied that such a plant will not be satisfactory."* For a period of two years, there was constant trouble with the plant and constant effort by appellant to remedy the trouble. Though not giving satisfactory service during that time, the respondent was not then satisfied that the plant *"will not be satisfactory,"* and did not become *"satisfied that such a plant will not be satisfactory,"* until November, 1927, when informed by a refrigeration engineer that twenty-four hundred dollars would be required to equip the system so it would function as contemplated by the contract. The rule is that

" . . . where the subject-matter of the contract relates to a thing which is ordinarily desirable only because of its commercial value or its mechanical fitness, it is held that the party must act in good faith and must be honestly dissatisfied. He must, if a test is necessary to determine fitness, give that test or al-

low it to be made, *and dissatisfaction should be expressed within a reasonable time when no time is fixed in the contract.*" 13 C. J., p. 678, § 770.

Cited in support of the text, is *Tatum v. Geist,* 46 Wash. 226, 89 Pac. 547, wherein it is stated:

"It follows, of course, that dissatisfaction must be expressed within a reasonable time."

The trial court was of the opinion that the respondent knew, or could have known, that the plant was not satisfactory, long before the lapse of two years during which the system was used. Surely, from August, 1925, to November, 1927, during which period the system was in operation, was a reasonable time for the inspection and test of the plant. Mr. Hudson, respondent's president, is a contractor and builder of twenty-seven years' experience. He testified that, from the time of installation until the system was removed, the refrigeration was unsatisfactory and many repairs were made; that he lived in the apartment house, commencing January 1, 1926. His experience as a builder and apartment-house owner and his admitted knowledge of failure of the plant to function from the date of installation are refutation of the argument that he was not possessed of information from which he could conclude whether or not the plant was satisfactory as a refrigerating system. That the evidence was such that he had reasonable grounds not to be satisfied with the plant as a refrigerating system, he, in effect, testified:

"Q. How did the plant operate immediately after it was installed? A. It apparently would frost up the tanks and then the next day it would be off and the odor would be so strong in the boxes that the food would spoil, and they kept telling me all the time that it was not the refrigerant we were smelling, it was from the box, so I had the boxes sprayed and so on, but the odor continued and it did continue until we

put in the other plant. *Many times I have taken food out of my refrigerator box and had to put the whole thing in the garbage because it was so tainted with this odor. I know others in the building had similar or the same experience. The complaint was coming to me from Mr. Shallenberger all the time. These complaints would come to me every few days through Mr. Shallenberger, my manager. They would send men up and keep them there for days at a time. Couldn't get anything, couldn't get it to work, and finally it just stopped and the men would tell us right there in that engine room, 'well, we don't know what to do; we can't fix it.' They were power plant engineering men and the man would tell us there, 'we can't do anything.' In July, August, and September (1925) there were complaints and I told them there were complaints at that time. And yet I paid the full 20 per cent because he was telling me all the time just a little adjustment; we would go to an apartment, the ones we did call on, very few, and this was nothing, somebody shut the valve off and they would adjust it. I never made any test myself. I never examined any of them. I leased the building myself to Mr. Pavey. He held it six months. He certainly did come and complain to me about the refrigeration.* I had nothing to do with the tenants while Mr. Pavey was my lessee. *When Mr. Pavey stepped down and out I operated it myself. I moved in January 1st, 1926,* and a month after I moved in I took a thermometer in my box and took the temperature. I found the temperature in my box about fifty-two. I expected to find forty-five. The odor in the boxes was not due to unseasoned spruce wood in the boxes. There certainly was a leak from the refrigerating frost box. The odor was there all the time during the life of that plant; there was odor in most all of those boxes. The odor must have come from some leak either in the valve or something of that kind. . . . I don't know of a single feature of this refrigerating plant that was not in accordance with the specifications.''

Operated more than two years, the refrigerating machinery was put to the test of actual use. There

was neither lack of opportunity nor was there dearth of time in which to ascertain whether the machinery was satisfactory. It is inconceivable that Mr. Hudson, a builder of years of experience, who lived in the apartment house, would be so negligent or slothful as to fail to discover facts prior to February, 1928, when this action was commenced, from which he could decide whether the plant was properly functioning. Though he knew all of the time from August, 1925, to November, 1927, that the plant was not operating satisfactorily, no dissatisfaction was expressed.

"The true doctrine is that, after discovering the facts justifying rescission, the party is entitled to a reasonable time in which to decide upon the course he will take. But this does not mean that he will be indulged in a vacillating or hesitating course of conduct, but that he must act with such a measure of promptness as can fairly be called 'reasonable' with reference to all the circumstances of the particular case. Particularly, he must, if possible, avoid such a delay as will make the ensuing rescission injurious to the other party or to the intervening interests of third persons. *He must use reasonable diligence in ascertaining the facts which may entitle him to rescind, and must act so soon after the discovery of them as that the opposite party will not be unnecessarily prejudiced by the delay.* 'The rule is that he who would rescind the contract must offer to do so promptly on discovering the facts that will justify a rescission, and while he is able of himself, or by the judgment of the court, to place the opposite party substantially in *statu quo.*' *This rule is applicable to all classes of contracts, including those in which one of the parties reserves to himself the right to rescind it at discretion. He is still bound to make his election within a reasonable time.* And the rule applies to a case in which the buyer of goods is given the right to return them in case they are not satisfactory to him, and to cases where an article is sold under an express warranty . . ." Black on Rescission & Cancellation (2d ed.), § 536.

The respondent's laches precludes recovery, therefore the judgment is reversed with instructions to dismiss the action.

MITCHELL, C. J., FRENCH, PARKER, and BEALS, JJ., concur.