# Richmond.

COCOA PRODUCTS COMPANY OF AMERICA, INCORPORATED, V.
J. N. MARIUS DUCHE, AND OTHERS.

March 19, 1931.

Present, Prentis, C. J., and Campbell, Holt, Epes and Hudgins, JJ.

The opinion states the case.

*R. B. Spindle, Jr.,* for the plaintiff in error.

*H. B. G. Galt, W. H. Starkey* and *Guy T. Horner,* for the defendants in error.

HUDGINS, J., delivered the opinion of the court.

The trial of this case in the lower court resulted in a verdict and judgment in favor of the defendants in error against the plaintiff in error for failure to deliver certain merchandise in accordance with the terms of a contract between the parties.

The plaintiff in error, with its principal office in Norfolk, was engaged in the manufacture of extracted cocoa butter, which is made from the residue of the cocoa bean with the addition of vegetable matter. The defendants in error were importers of confectioners' and bakers' supplies and grocery

sundries and manufacturers of gelatine, with their principal office in London and branch offices in Chicago, New York and Boston.

On May 29, 1924, the parties entered into the following contract:

"Cocoa Products Company of America, Inc., hereby agrees to sell and deliver and T. M. Duche & Sons agree to purchase and receive the products specified below, on the terms and subject to the conditions following:

"Quantity. Three to five cars, of 30,000 lbs., each during 1924.

"Products. Pure Extracted Cocoa Butter U. S. P. bouquetted.

"Price. Twenty (20) cents per pound.

"Terms. Net cash 10 days F. O. B. Norfolk, Va.

"Shipment. As wanted. Two to three weeks' notice of shipping dates to be given by buyer.

"Other conditions. Subject to strikes, fires, floods, wars, delays in transportation, and all other causes beyond the control of either party; this contract to be deemed suspended so long as such causes prevent or delay its execution.

"Each shipment to be considered a separate sale.

"Payment to be made in New York exchange; and if not made in accordance with the terms herein, seller to have the option of cancelling all undelivered quantities.

"The parties agree to keep all the terms hereof strictly confidential."

The Cocoa Products Company will hereinafter be referred to as the seller and Duche & Sons as the buyer.

The first error assigned was to the giving, at the request of the buyer, Instruction No. 1, which reads as follows:

"The court instructs the jury that under the contract the plaintiff had the option to purchase three or five cars of the extracted cocoa butter, and if they believe from the evidence that the plaintiff elected to purchase five cars, then five cars

was the amount sold and should have been delivered to the plaintiff under the provisions of the contract."

The objection made to this instruction was that the contract as to more than three cars was not supported by valuable consideration, nor was it mutual in its terms. The terms of the contract were that the seller agreed to ship, as ordered by the buyer, from three to five cars. The place and the time in which the contract was to be performed were definite and specific. The buyer had the right to order within the time specified the maximum number of cars named in the contract, the seller promised to ship them as ordered. This was the construction placed on the contract by the parties. The buyer exercised this option and demanded of the seller the maximum number of cars promised. This part of the contract is very similar to the one construed in the case of *Smokeless Fuel Co.* v. *Seaton & Sons,* 105 Va. 170, 52 S. E. 829, 830. In that case the terms were that the "party of the first part has sold to the said party of the second part 1,000 to 1,500 tons New River R. O. M. steam coal." In that case the court said:

"We think the contract under consideration meets the requirements of this general rule. It is clear and definite in its terms, between competent parties, and for a valuable consideration, to-wit: The promise of the seller to deliver the coal as ordered, within the time prescribed, and the promise of the buyer to receive the same and pay the price agreed upon. Under the terms of the contract, the plaintiffs were bound to take not less than one thousand nor more than fifteen hundred tons. There was, therefore, not only a valuable consideration to sustain the contract, but absolute mutuality of engagement."

See *Turner* v. *Hall,* 128 Va. 247, 104 S. E. 861.

The second error assigned is in the refusal of the trial court to instruct the jury that the seller had the right to terminate the contract on the failure of the buyer to pay for a car

shipped on October 7, 1924, if the buyer failed to pay within ten days from the date of delivery, and the action of the court in giving, at the request of the buyer, an instruction involving the principle of waiver.

The undisputed evidence shows that five shipments were made and paid for as follows:

| Invoice | Amount | Price | Paid |
|---------|--------|-------|------|
| June 26th | 10,043 lbs. | $2,008.60 | July 12th |
| July 10th | 9,891½ lbs. | 1,987.30 | July 30th |
| Sept. 11th | 11,487½ lbs. | 2,297.40 | Sept. 26th |
| Sept. 27th | 10,164½ lbs. | 2,032.90 | Oct. 9th |
| Oct. 7th | 30,082 lbs. | 6,016.40 | Oct. 28th |

The seller contends that by the terms of the contract he had a right to cancel it for failure on the part of the buyer to pay for shipments within the time specified. The buyer admits that under the strict stipulations of the contract this construction is correct, but contends that the course of dealings and the correspondence between the parties show that the seller waived the right of cancellation.

The evidence relied upon to show waiver is as follows: The payment for the shipment made June 26th was due July 6th. On July 10th the seller had not received the money, so he sent a wire to the buyer requesting to know when he might expect payment, to which the buyer replied that check was in the mail. On receipt of this check the seller wrote the buyer the following letter:

"This will acknowledge receipt of your check for $1,484.82 covering our invoice of June 26th. We wish to thank you for your prompt attention in forwarding this check to us.

"We are very sorrow that we found it necessary to call upon you for these funds, but it was entirely due to some extra heavy commitments that we were obliged to meet.

"Again thanking you, we are," etc.

It seems that the buyer was entitled to a credit of $523.78

which, added to the sum named in the above letters, makes the amount due for June shipments. Payments for each of the next three shipments were a few days late, but no objection was raised thereto by the seller and the transactions between the parties seem to have been mutually satisfactory, until this controversy arose.

On October 7th the seller shipped a car of 30,082 pounds to the buyer, for which it had evidently received previous shipping instructions. This made a total of 2-1/3 cars delivered. On the same date the buyer wrote the seller the following letter:

"We have your letter of the 4th inst. and we note that you require shipping instructions on another 2-2/3 cars in order to complete our order with you which was for three to five cars, our option. You can ship one car of fifteen tons to our New York house on or before October 31st, one car to us on December 1st, and the balance of 2/3 of a car we will give you shipping instructions prior to the expiration date of the contract. We trust this clears up the matter to your entire satisfaction. You might communicate with our New York house and get their final shipping instructions regarding the carload for them."

From this letter it is evident that the seller had on October 4th written the buyer asking for shipping instructions, notwithstanding the delayed payments for the previous shipments, thereby waiving the right to cancel for previous delays in payment. On October 11th the seller wrote the buyer, in part, as follows:

"We received from your New York office an order for five tons of butter yesterday which we are unable to accept. We are writing them as per enclosed copy. We regret this circumstance very much indeed but feel that we are not at fault in the matter. We certainly value your good will very much indeed and will do everything we can to serve you. We must, however, ship our customers in rotation as they have given us shipping directions. We will try to get the car off to

New York early in November, but it is impossible for us to ship a pound not already booked for October delivery. We will do our best to increase our production and to give your New York office the best service possible.

"We will endeavor to take care of your December car as directed. We trust this will be satisfactory and thanking you, we are," etc.

From these two letters it appears that the buyer had given shipping instructions for 4-1/3 cars and stated he would give shipping instructions for 2/3 of a car before December 31st. The seller acknowledged the obligation of the contract in his letter of October 11th and promised to ship the two cars as requested by the buyer, stating, however, that the car requested for October could not be delivered until early in November.

It is true that at the time this letter was written the payment for the October 7th shipment was not due. It was due, however, on October 17th, and on October 21st the seller wrote the buyer the following letter:

"We are faced with a shortage of raw material of the quality demanded by our business. Whether this is due to an undertaking amongst our competitors who are also our suppliers we are unable to say. In any even(t), we are in a serious situation as regards the amount of butter required to fill our contracts.

"We are giving you this information as early a date as possible so that you will be able to take care of your requirements. As we find, it seems probable now that we cannot fill our contracts in whole. As the matter now stands it looks as if we will not be able to ship more than one car for the balance of the year and the other contracts will have to be curtained (curtailed) pro-rata.

"While this is a condition which was entirely unforeseen and unfortunate, we trust you will bear with us temporarily and permit us to cut your contract down to one car for delivery the latter part of November or early in December.

May we please hear from you to the effect that this is agreeable? If we can supply a greater quantity we will be glad to do so. As you can understand, it is hard for us to write a valued customer to the above effect and we regret the necessity for it very much indeed.

"The situation may clear up later but just at this writing it does not look like it. In case it does we will give you prompt notice.

"Regretting that this condition exists and with many thanks for your valued favors."

At the time this letter was written the seller knew that the buyer was in default of the payment for the shipment made on October 7th, and there was no intimation in the letter that he expected to take advantage of the default in the buyer, but there are clear statements in the letter recognizing the seller's obligation under the contract and asking for indulgence because it was hard for the seller to buy the raw material necessary for his manufactured product. The intimation from the letter is that if the raw material mentioned could be obtained by the seller he expected the buyer to accept deliveries. The check for the October 7th shipment was dated October 25th and seems to have reached the seller on the 27th and credit given on the 28th of October. On the 29th the seller attempted to rescind the contract by the following letter:

"This is to acknowledge receipt of your wire asking us if we can positively undertake to deliver to you five or ten tons of butter within thirty days. We replied as per confirmation sent you stating that we could. We would be very glad to arrange to do this with the understanding that this will be part of the car we have planned to deliver to you before January first.

"We are enclosing a copy of letter received from your New York house and are sending them a copy of this letter as our reply thereto. We are doing the best we can for you under existing conditions and certainly are not trying to kill the

good will of a valued customer by withholding shipments when all we have to do is to cancel the contract if we so desire.

"In view of the threat contained in Mr. Graessle('s) letter we herewith cancel the contract and you can consider this as being legal notice to that effect. This cancellation is based upon your failure to live up to the terms of the contract as entered into between us. If you read the contract you will see that we have sufficient grounds for this action.

"Now that that is settled and we have protected ourselves against any such action as Mr. Graessle intimated you will take to force us to make the deliveries, we wish to assure you that we will deliver to you five or ten tons within the next thirty days and the balance of fifteen tons between now and January first at twenty cents, the price at which the original lot was sold to you.

"We trust that this will prove to you our good intentions and our desire to retain your good will and business."

In the first paragraph of this letter the seller again recognizes the existence of the contract and states that he had sent the buyer a telegram in response to one received from him, presumably sent on receipt of the letter of October 21st, asking if the seller could deliver five or ten tons within thirty days.

When the contract gives to a party the right to rescind, if he expects to take advantage of this right he should do so promptly and unequivocally after knowledge of default. As stated in 24 Am. & Eng. Law (2d ed.), p. 1105:

"The right to rescind must be exercised promptly upon the discovery of the facts authorizing rescission. Any unreasonable delay in rescission, or any further dealing or action in respect to the contract as though it were still in force amounts to a ratification or election to abide by the contract and is a bar to a subsequent rescission."

In Black on Rescission and Cancellation, 2 Vol. sec. 604, it is stated:

"If, however, there has been repeated delay on the part of

the purchaser in making his payments, and habitual indulgence on the part of the vendor in giving him time, so that the course of their dealings might reasonably lead the vendee to believe that strict compliance with the terms of the contract would not in the future be insisted on, then it would be inequitable to permit the vendor to take sudden and sharp advantage of a subsequent default and declare a forfeiture forthwith; and in order to preserve his right to do so, it will be necessary for him to give the vendee notice that he intends thereafter to insist on strict punctuality in payment, and the notice must be so timed as to give the vendee a reasonable opportunity to comply with its terms."

The facts in the case of *Miller & Co.* v. *Lyons,* 113 Va. 275, 74 S. E. 194, 199, are similar to the facts in the case at bar. In that case, Lyons had been dealing with Miller & Company in the purchase of stock for a period of more than four years, and each time that he purchased stock he was given a receipt, which read, in part, as follows:

"It is understood that on all marginal business we reserve the right to close transactions for your account without further notice, whenever your margins are running out, and to settle contracts in accordance with the rules and customs of the New York Stock Exchange."

Finally Miller & Company, without notice to Lyons, closed the transaction by selling his stock. The court held that by the course of dealings between the parties Miller had waived the benefit of the right to sell the stock without giving Lyons notice of such intention.

In the above case, as in the one at bar, each transaction was a separate purchase or sale. The rule was there stated by Keith, P., thus:

"That covenants and stipulations made by a covenantor for his benefit may be waived by him, either by express terms or by a course of dealing, is a well-established principle in every system of enlightened jurisprudence. That a covenantor

may by his conduct so lull his covenantee into a sense of security as thereby to estop himself from the exercise of a right for which he had contracted is equally clear. Instances illustrating this principle abound in the law with reference to contracts of insurance, but its operation is not limited to any specific class of contracts and dealings between men. Such estoppels are founded upon principles of morality and public policy; their objects being to prevent that which deals in duplicity and inconsistency. *Bower* v. *McCormick,* 23 Gratt. (64 Va.) 310."

In the case of *Richmond Leather Mfg. Co.* v. *Fawcett,* 130 Va. 484, 107 S. E. 800, 808, which case was again before this court and reported in *Fawcett* v. *Richmond Leather Mfg. Co.,* 155 Va. 518, 155 S. E. 714, it is said:

"A series of dealings in which delayed deliveries are accepted and paid for, and further deliveries demanded, justifies the party in default, in the absence of anything to the contrary, in concluding that the contract will not be rescinded on account of such delayed deliveries without notice. Under such circumstances, rescission without notice on account of delayed delivery will be in derogation of the accustomed course of dealing between the parties."

We have carefully examined each of the cases cited by the seller to support his contention that he had a right to cancel the contract, but the facts in the cases relied upon are distinguishable from the facts in the instant case. In the majority of the cases cited the seller had repeatedly protested against delayed payments by the buyer, and notwithstanding these protests the buyer continued in default. In a few of the cases the seller cancelled on the first default on the part of the buyer. The cases support the general rule that the mere acceptance of delayed payment is not sufficient of itself to prevent the seller from exercising the right given by the contract to cancel on account of payments not being made within the time specified by the contract.

The facts proven justified the trial court in refusing

a peremptory instruction whereby the jury would have been told, in effect, that there was no evidence to justify a verdict for the buyer. The instructions fairly submitted the question of waiver to the jury.

The seller assigns as error the action of the court in striking out that part of the following instruction which is in italics:

"The court instructs the jury that under the contract between the parties to this suit, the defendant had the right to terminate said contract as to any undelivered quantities of cocoa butter at any time for failure of plaintiff to pay for cocoa butter shipped within ten days and if you believe from the evidence that the plaintiff failed to pay for the invoice of October 7, 1924, within ten days and that defendant notified the plaintiff of the cancellation of the contract for that reason they should find for the defendant unless they believe from the evidence that the defendant had waived that right. To constitute a waiver, the defendant must hav(e) intentionally abandoned or relinquished its right either expressly or impliedly. *The waiver of a subsequent default is not presumed from a previous default, but must be proved by a preponderance of the evidence.* There is no evidence of an express waiver of the right to cancel for non-payment within ten days of the invoice of October 7th, and it is for the jury to say whether there was an implied waiver thereof by the conduct of the defendant. To constitute an implied waiver there must be some clear, unequivocal and decisive act of the defendant showing a purpose to abandon or relinquish its said right, and the burden is upon the plaintiff relying upon such waiver to prove the same."

The part stricken out is a correct statement of the law, but is not applicable here. The trial court did not commit reversible error in eliminating that part of the instruction because the facts in the case show that the seller not only accepted payments after they were due, but thanked the buyer

for his promptness in remitting, and after the failure of the buyer to pay within the time specified the seller wrote repeatedly asking for shipping instructions, in his correspondence expressed satisfaction with the manner in which the buyer was performing his part of the contract, and after the seller had knowledge that the buyer was in default in payment due October 17th, he recognized his obligations under the contract.

■■ The instruction given on damages reads:

"The court further instructs the jury that the measure of damages for failure to deliver merchandise is the difference between the contract price and the market price at the time or times and place of delivery; and if the jury shall find for the plaintiffs they shall assess their damages at the difference between the contract price of twenty cents per pound, plus freight to Philadelphia, New York or Chicago, and the price at which they believe from the evidence the cocoa butter could be bought on the market at one of the said cities, taking the average market price during which the said butter might have been delivered between the breach of the contract and December 31, 1924, and the jury may consider the market prices of pressed butter in determining the price of the extracted butter."

The seller raises two objections to this instruction. It appeared from the evidence that there was no general market for cocoa butter in the city of Norfolk and that Philadelphia was the nearest market to Norfolk, the point of delivery.

The first objection is that there was no evidence introduced showing the market price in Philadelphia, and that the jury should not be permitted to consider the market price in either New York or Chicago. The testimony of Mr. Woollard for the buyer was that the market prices given by him were the same in Philadelphia, New York and Boston. The instruction told the jury that to the contract price must be added the freight, and the difference between this sum and the market

value of the product was the basis on which to assess damages. There is no merit in this objection.

The other objection is that the instruction is too indefinite as to the time as of which the market value should be ascertained by the jury. It is also claimed that the buyer in his letter of October 7th had given definite shipping instructions and those dates should control. In this connection, it is well to note that on December 15, 1924, the seller shipped a car of the cocoa butter to the buyer, and charged therefor the contract price. This is the same car referred to in the letter of October 29th. No further reference thereto is necessary except to state that the buyer gave credit therefor in his claim for damages.

The commodity, described in the contract as "pure extracted cocoa butter U. S. P. bouquetted," is manufactured solely by the seller and is used mainly as a substitute for prime cocoa butter, a well known commodity used in the manufacture of candies. There seems to be no general market value for the article sold, but the market value of the prime cocoa butter could be easily ascertained in New York, Philadelphia, Boston and Chicago. The evidence shows that the value of the substitute was one cent per pound less than the better known prime cocoa butter. It became necessary, in order to ascertain the damages to prove the market value of prime cocoa butter. The buyer proved the market value of prime cocoa butter in New York, Philadelphia and Chicago, and he showed that there was a slight variation between October 31st and December 31st. The seller contends that the market value should be ascertained at the time of the breach, while the jury were instructed to take the average price between October 31st and December 31st. The seller, in his letter of October 11th, promised to deliver a car early in November, which seems to have been acceptable to the buyer. On November 7th the market value was 27-3/4 to 28 cents. On November 14th the price had advanced to

28-1/2 to 30 cents per pound. The freight rates by rail from Norfolk to New York in carload lots were 58-1/2 cents per 100 pounds; by water, 55 cents per 100 pounds. Add the freight, the differential in price between pressed cocoa butter and the article sold and the contract price we have .21585 per pound. The difference between this and the market value on November 14th is a fraction less than six cents per pound, which is the exact amount of the jury's verdict. If the freight rates by water were used in the calculation the loss to the buyer would be greater. If the average market price and the cheaper freight rate between October 31st and December 31st are used as a basis for calculating damages, the result would be less than the jury's verdict.

While the instruction is not a model to be followed, the seller fails to show that it has been injured thereby. Our conclusion, therefore, is that the judgment should be

*Affirmed.*