**LOMA LINDA UNIVERSITY**

v.

**DISTRICT–REALTY TITLE INSUR-
ANCE CORPORATION et al.,
Appellants.**

No. 23353.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 21, 1970.

Decided Feb. 12, 1971.

Mr. Thomas Penfield Jackson, Washington, D. C., for appellants. Mr. Austin P. Frum, Washington, D. C., was on the brief for appellants.

Mr. Harold T. Grier, Washington, D. C., for appellee.

Before McGOWAN and MacKINNON, Circuit Judges, and DAVIES*, U. S. District Judge for the District of North Dakota.

MacKINNON, Circuit Judge:

This appeal is from a judgment awarding a $15,000 deposit plus interest to a contract vendor (appellee) who had agreed to sell a certain plot of land free of all covenants, conditions or restrictions. At issue is the validity of the cancellation of the contract to purchase the land by the contract purchaser (appellant).

Under date of March 29, 1966, appellant Capitol Land Corporation (Capitol) entered into a written contract to purchase a plot of land comprising approximately 370 acres in Montgomery County, Maryland, from appellee, Loma Linda University (Loma Linda). In conformance with the terms of the agreement, Capitol placed a deposit of $15,000 with appellant District-Realty Title Insurance Corporation (District-Realty) to be applied as part payment of the purchase of the 370 acres. The purchase price for the property was set at $740,000, based on a price of $2,000 per acre, and was to be adjusted upward or downward as a survey showed more or less than 370 acres. The settlement date of the contract is an important element in this case and was to be determined by the terms of the contract. In this respect, as the trial court pointed out, paragraph 8 of the contract provided:

*Time is of the essence of this Contract and within 90 days from the date of acceptance hereof by the Seller, or within —— [sic] days after all contingencies have been eliminated or as soon thereafter as a report on the title can be secured if promptly ordered, and an appointment can be made with the Title Company for settlement, the Seller and Purchaser are required and agree to make full settlement in accordance with the terms hereof. If the Purchaser shall fail to do so, the deposit herein provided shall*

---

* Sitting by designation pursuant to Title 28, U.S.Code, Section 292(c).

*be forfeited as the sole remedy of the Seller and the Purchaser shall thereby be relieved from further liability hereunder.*

Thus, the settlement date was not fixed precisely, but could have been either of several dates depending on circumstances, i.e., (1) within 90 days from the date of acceptance of the contract by the seller or (2) if contingencies (title or other) arose, then within an unspecified number of days after all contingencies had been eliminated or as soon thereafter as a report on the title could be secured if promptly ordered and settlement date fixed with the Title Company.

The settlement date was originally set for July 5, 1966 but because of the discovery of certain restrictive easements it was extended. The details of these extensions are discussed hereafter in considerable detail.

The clause of the contract which causes the principal dispute here provides:

6. The property is sold free of encumbrance except as aforesaid; title is to be good of record and in fact and merchantable; the property covered by this contract shall be subject to no covenants, conditions or restrictions, recorded or unrecorded as could in the sole discretion of Purchaser in any way whatsoever affect or interfere with the economic development and/or use of the same at maximum density under applicable zoning and building regulations except customary rights of way for utilities and utilities installations; otherwise the deposit is to be returned and the sale declared off at the option of the Purchaser.
\* \* \*

After the contract was executed, District-Realty prepared a title report. This report, dated May 17, 1966, disclosed the existence of two easements 50 feet wide for long distance natural gas pipelines across the property.[1] One pipeline easement ran across the entire property at its approximate center and the other across the entire property near the western end of the plot. These easements cut up the tract into three segments. Herbert G. Kaufman, the president and sole stockholder of Capitol (the contract purchaser), undertook to obtain more specific information about the pipeline easements and to that end hired an engineering firm to make a survey of the property. The initial survey showed the approximate location of the easements [2]; thereafter Kaufman was granted an indefinite extension of the settlement date so he could make additional studies of the location and of the effect of the easements upon the proposed development of the property as a residential subdivision. By the following October, an accurate survey of the easements had been prepared which Kaufman turned over to another engineering firm to determine a possible layout for the property and to calculate how many lots could be platted out of the plot. This study was completed in October and it concluded that improvements could not be built over the right of way of the pipelines and that manholes allowing access to the pipelines would have to be put into any street built over the right of way,[3] with the result that 6.88 acres of land would be lost for purposes of development.

After receiving the results of this study, the three men who had previously

1. The parties stipulated that these pipeline easements were not "customary rights of way for utilities and utilities installations" within the meaning of the contract provision quoted above. Finding of Fact No. 9, Joint App. p. 56.

2. The exact location of the pipeline easements could not be determined at this time because the boundaries and dimen-

sions of the easements had been incorrectly recorded on the land records. Finding of Fact No. 10, Joint App. p. 56.

3. Finding of Fact by trial court, No. 13. There was also uncontradicted testimony that the easements required the laying out of streets "in an abnormal manner and this is what prompted our decision." Joint App. p. 39.

agreed to back Kaufman financially on the land transaction withdrew their support.[4] At about the same time, a "tight" money market developed, and as a result of these two developments Kaufman found himself faced with financing difficulties. At about this time Kaufman also informed Kelly Litteral, Loma Linda's attorney, that he was concerned about the effects of the easements on the development of the land.

There is a conflict in the testimony as to what transpired next. Litteral testified that he and Kaufman orally agreed to go to settlement with the understanding that Loma Linda would convey 6.88 acres of land within the easement area without consideration. Kaufman testified that he was surprised by Litteral's testimony to that effect and that he did not recall making any such agreement. In any event, District-Realty sent letters on December 20, 1966 to Litteral and Capitol informing them that settlement would be made on December 29th in District-Realty's offices.

On the 29th at 7:46 A.M., Capitol cancelled the contract with the following telegram to Loma Linda University:

> We hereby cancel our contract of March 29th 1966 in accord with paragraph 6 as pipelines interfere with economic use accord to our engineer letter to follow
>
> Capitol Land Corp.

Loma Linda replied the same day with a telegram to Capitol insisting on settlement as scheduled, and itself proceeded to complete its part of the settlement on the 29th by tendering to District-Realty a deed to the property along with an adjustment represented in the settlement sheet to the effect that no charge (at $2,000 per acre) was being made for the 6.88 acres of land within the easement area.

Loma Linda, through Litteral, continued to press for settlement for the next few weeks and there was testimony that on January 9, 1967 the parties apparently again agreed to go to settlement. However, no settlement date was ever set nor was any settlement made and Litteral thereafter demanded that District-Realty pay over the $15,000 deposit to Loma Linda. District-Realty refused and finally on June 16, 1967, Loma Linda filed its complaint in the instant case seeking the $15,000 deposit as liquidated damages for Capitol's alleged breach of contract.

The case came to trial in May of 1969. The trial court without a jury concluded that Kaufman and his financial backers "were able and willing to invest in the subject property * * * were ready to go to settlement on the * * * [originally scheduled date of July 5, 1966] and would have done so but for the discovery of the existence of the pipeline easements"; that Kaufman's financial backers completely lost interest in the transaction upon receipt of the October, 1966, engineering study which showed the effects of the easements upon the development of the land, and at about this time a "tight" money market developed; that in early December, Kaufman relayed his concern to Litteral about the land lost to development due to the easements and that Litteral obtained the consent of Loma Linda to convey this land (6.88 acres) without charge; that the parties then agreed that they "would try to get" settlement on December 12th or 19th; however, these dates were unavailable to District-Realty so the parties agreed on December 29th as the closing date; that Capitol telegraphed its cancellation of the contract on the 29th and Loma Linda completed and proffered its part of the settlement on that date; that on or about the 9th of January, 1967, Kauf-

---

4. A first trust deed was to be given back for 80% of the sales price due in ten years and bearing interest at the rate of 6½% per annum, payable interest only for three years, thereafter seven equal annual principal payments, first payment of principal, plus interest, due four years from date of settlement and each and every year thereafter until paid in full.

man advised Litteral that he had arranged his financing and would go to settlement but that no subsequent settlement date was fixed and Kaufman did not go to settlement; and that Litteral thereafter on behalf of Loma Linda demanded the $15,000 deposit from District-Realty. The trial court then ultimately concluded that:

There is no evidence that Kaufman informed any representative of plaintiff of his financial condition prior to January, 1967. Nor did Kaufman inform plaintiff prior to the morning of settlement that he was cancelling the contract in accordance with paragraph 6 thereof because the pipelines interfered with the economic use of the land. On the contrary, his failure to raise any point concerning the economic development of the entire tract of land, but only change as to the area involving the pipeline easements and his joining in fixing a settlement date after Litteral had obtained consent of Loma Linda to convey the 6.88 acres without payment therefor, together with his representations to Kelly Litteral during January, 1967, indicate and the Court finds that the reason defendant failed to complete settlement of the contract was Kaufman's financial inability to do so and not because he in good faith believed that the economic development or use of the land would be interfered with by the existence of the pipeline easements. The Court finds that in refusing to go to settlement and in cancelling the contract the defendant abused the discretion given it in paragraph 6 of the contract and acted arbitrarily and in bad faith.

Finding of Fact No. 22, Joint Appendix 60–61.

The court then entered judgment for Loma Linda, from which District-Realty and Capitol took this appeal. We reverse and enter judgment for appellants District-Realty and Capitol.

I

Courts have often been called upon to construe provisions in land contracts similar to the one in the instant case. In such cases, the issue most frequently presented for resolution is whether a contract is illusory when the purchaser's obligation to perform is conditioned upon his "satisfaction" with the performance tendered by the vendor. Although a few courts have held that such conditions do make the contract illusory,[5] the great majority have upheld contracts of this nature on the ground that they do impose an obligation on the purchaser[6] and excuse his performance only if his dissatisfaction is either "reasonable"[7] or in fact honest and in good faith.[8]

Here neither party has challenged the contract as being illusory, and we agree with the great weight of authority that it is not. We must consider, therefore, the precise nature of the obligations imposed on the parties by the terms of clause 6. In our opinion that clause gave Capitol an option to terminate the contract, the exercise of which was conditioned upon, inter alia, its conclusion that the easements would interfere with the economic development

5. E. g., Boyd v. Woodbury County, 122 Iowa 455, 98 N.W. 274 (1904); Friendly v. Elwert, 57 Or. 599, 105 P. 404 (1909).

6. Cases cited notes 7 and 8, infra. See generally 55 Am.Jur. Vendor and Purchaser § 163 (1964); Annot., 47 A.L.R. 2d 455 (1956).

7. Goldberg v. Feldman, 108 Md. 330, 70 A. 245 (1908); Latrobe v. Winans, 89 Md. 636, 43 A. 829 (1899); Cummins v. Dixon, 265 S.W.2d 386 (Mo.1954); Calvin v. Custer County, 111 Mont. 162, 107 P.2d 134 (1940); McCubbins v. Simpson, 186 Okl. 417, 98 P.2d 49 (1939); Dillinger v. Ogden, 244 Pa. 20, 90 A. 446 (1914).

8. Mattei v. Hopper, 51 Cal.2d 119, 330 P. 2d 625 (1958); Liberman v. Beckwith, 79 Conn. 317, 65 A. 153 (1906) ("But the mere fact that the jury believes the purchaser's dissatisfaction to be unreasonable does not justify them in inferring his dishonesty. * * *"); Hollingsworth v. Colthurst, 78 Kan. 455, 96 P. 851 (1908); Campbell v. Hart, 256 S.W. 2d 255 (Tex.Civ.App.1953).

of the land. This means that if Capitol considered that the economic development of the land would be hindered by the easements, it had the legal power to terminate the contractual relations then existing between the parties.[9] It does not mean, however, that the *fact* that Capitol concluded that ecomomic development would be hindered in and of itself terminated the contractual relations, for in order for Capitol's conclusion to be translated into effective legal action it was required to exercise its option to terminate by giving timely notice, with assigned reasons, to Loma Linda.[10] Moreover, the *fact* that Capitol believed that the easements would hinder economic development did not mean that it could terminate the contract for completely different reasons, for the relevant legal power conferred on it by the option was the power to end the contract because of, and only because of, its belief in the economic injury likely to be caused by the easements.[11] Apart from the reasons stated in clause 6, Capitol bound itself to buy the property from Loma Linda.

In order to apply the principles discussed above, and thereby determine whether Capitol validly exercised the power given to it by clause 6, three related questions must be considered: (1) was there a "covenant, condition or restriction" to which the land was subject; (2) did Capitol believe, under the appropriate standard, that such covenant, condition or restriction would "affect or interfere with the economic development and/or use" of the property at maximum density under the zoning regulations; and (3) was such belief a "reason" for Capitol's termination of the contract.[12] An affirmative answer to all three questions is necessary before Capitol can be found to have validly exercised its power to terminate. In addition, though the questions are related, they must be considered independently, because an affirmative answer to (1) and (2) does not preclude the possibility of a negative answer to (3).

The answer to question (1) is that there was a "covenant, condition or restriction" to which the property was subject—the pipeline easements earlier described—and the trial court so found. The court made no specific finding concerning question (2), and the parties, concentrating their energies on question (3), have almost completely ignored it. We shall assume, therefore, that the parties are agreed that Capitol did believe, under the appropriate standard,[13] that the restrictions would interfere with the economic development of the land as referred to in the contract.[14] Indeed, on the facts of this case, it would be extremely odd if they did not because Capitol had considered from the outset that responsible co-entrepreneurs were necessary and made arrangements for them to join in the enterprise, only to lose them when it was found that the plot was cut up by restrictive easements.

In answering question (3), the trial court made two crucial findings of fact. First, it found that Capitol's backers

9. 1A A. Corbin, Contracts § 259, at 460, § 265, at 533–536 (1963).

10. *See generally id.* § 265.

11. 3 Williston, Contracts § 675A, at 1945 n. 5 (Rev. ed. 1936) ; Comment, 2 Cornell L.Q. 36 (1916) ; *see* Restatement, Contracts § 265, Comment A.

12. A fourth question, whether timely notice was given, is considered at page 779, *infra.*

13. Since we make this assumption, we have no need to decide which of the standards of "satisfaction" contained in

the cases cited at notes 7 and 8, *supra,* is applicable to this transaction.

14. This assumption is strengthened by the statement in appellee's supplemental reply brief that "[i]t is undisputed that [Capitol] had a right to rescind the contract when it found out about the pipeline easements. * * *" In order for such right to have existed, Capitol must have in fact believed that the easements would interfere with the economic development of the property. That Loma Linda does not dispute that Capitol had this right necessarily implies that it does not dispute the existence of Capitol's belief.

were ready to go to settlement on July 5, 1966, that they would have done so but for the discovery of the easements and that it was this loss of financial backing plus the development of a tight money market that caused Capitol to decide it was necessary to cancel the transaction at that time. Secondly, the trial court found that Capitol refused to go to settlement on December 29th because of its financial inability to do so and not because of its belief that the development of the property would be hindered by the easements. Based on these findings, it answered question (3) in the negative, saying that Capitol did not terminate the contract for a proper reason.

■■ We accept the court's findings of fact, but under the circumstances of this case, disagree with the conclusion it has drawn from them.[15] In the first place, it is our view that the words "economic development and/or use" etc. as they are used in clause 6 of the contract include the purchase of the land, for the purchase of the property was a necessary first step for Capitol to take in its development or use of the land. So construed, clause 6 gave Capitol the power to terminate the contract if it felt that the easements would interfere with its ability to purchase the property. Secondly, the facts found by the trial court clearly indicate that Capitol's financial inability to complete the deal was due to its inability to arrange substitute entrepreneurs after its original backers withdrew their support. Finally, the facts show, and the trial court found, that the discovery of the easements triggered the withdrawal of Capitol's initial backers. In view of these facts, we hold that the trial court's finding that Capitol cancelled the contract because it was financially unable to go to settlement was tantamount to a finding that a reason for its cancellation was that the easements had *in fact* interfered with the development of the property within

the meaning of clause 6. It is thus our view that the proper conclusion to be drawn from these findings is that Capitol cancelled the contract because of the actual effect of the easements on the development of the property and thus was acting well within the scope of the power given to it by clause 6 of the contract.

That Capitol's financial difficulty was caused in part by a developing tight money market does not alter our conclusion. Clearly a combination of forces precipitated Capitol's decision to exercise its power to terminate the contract. The trial court, as above stated, found that the decision of Capitol's initial backers to withdraw their support of the venture was caused by the discovery of the easements. That Capitol's subsequent inability to obtain alternate backers may have been the result of the development of a tight money market does not mean that the results of the discovery of the easements are not to be considered a cause of, and a reason for, its termination of the contract any more than an inability to obtain water to put on a burning building would mean that fire was not a cause of, and a reason for, its eventual destruction. Since Capitol had one valid reason for the exercise of its power to terminate the contract, whatever additional reasons it may also have had are legally irrelevant to a determination of whether it validly exercised its power under clause 6.

II

■■ Loma Linda next argues that even if Capitol had the right to cancel the contract because of the easements, it nevertheless waived that right by (1) its delay in cancelling, and (2) its alleged subsequent agreement to take the 6.88 acres free of charge. We may deal summarily with the first contention. Although the contract was made in March

---

15. This court has previously noted its agreement with a trial court's findings of fact while nevertheless disagreeing with that court's ultimate finding or conclusion. *See* Neff v. United States, 136 U.S.App.D.C. 273, 275, 420 F.2d 115, 117 (1969), cert. denied, 397 U.S. 1066, 90 S.Ct. 1500, 25 L.Ed.2d 687 (1970).

of 1966, Capitol was not even aware of the existence of the pipeline easements until May, at which time the closing date was extended to permit the gathering of more information about the easements and their effects on the development of the property. It was not until the following October, after the precise location of the easements had been determined, that Capitol was able to complete an engineering study of the effects of the easements on the potential development of the land. This study was completed that October. By early December, there was testimony that the parties had set a settlement date (according to the trial court's findings of fact). Thus the elapsed time between the completion of the study and the setting of a settlement date was only slightly more than one month. This was not an unreasonable delay and thus did not constitute a waiver.[16]

■ Loma Linda next argues that an agreement was reached between it and Capitol whereby Capitol would receive the 6.88 acres within the easement area without charge, and that in making this agreement Capitol waived any right it had to cancel the contract because of the easements. However, Kaufman testified that he did not recall making any such agreement and the trial court's findings do not go so far as to find that he did. The trial court's finding on this disputed point was as follows:

Litteral obtained the consent, of the plaintiff, his client, to convey the land within the easement area to the defendant or its designee without any payment therefor. The above-mentioned fact was conveyed to Kaufman who then agreed with Litteral that they would *try to get settlement* at the title company during the week of December 12, 1966, or December 19, 1966. Neither time was available at District [District-Realty] so on or about December 15, 1966, all parties agreed that settlement would be held on December 29, 1966. * * * (Emphasis added.)

The trial court thus did not find that an agreement had been reached. It found only that the parties "would try to get a settlement" on a certain date which was changed to a later date. We cannot imply from this finding either an oral modification of the written contract or an express waiver of Capitol's right of cancellation. In our opinion, the agreement to "try to get settlement" indicates only that Capitol was still interested in the transaction at this point and was making a bona fide effort to obtain substitute backers. Capitol continued hopeful until the very last but within a month it finally found that it could not replace the original backers. It was then unable to proceed to settlement and hence elected to cancel the contract because of the effect of the easements (restrictions), but this was precisely the right it had reserved to itself under its contract.[17]

We therefore reverse and remand to the trial court with directions to enter judgment for appellants Capitol and District-Realty.

Reversed and remanded.

16. A right to cancel a contract specifically provided by the contract itself must be exercised within a reasonable time after discovery of the facts upon which cancellation is predicated. As long as it is exercised within that period, the right is not waived. Cocoa Prod. Co. v. Duche, 156 Va. 86, 158 S.E. 719 (1931); John S. Hudson, Inc. v. Power Plant Eng'r Co., 154 Wash. 172, 281 P. 324 (1929); *see* Davidson Hardware Co. v. Delker Bros. Buggy Co., 170 N.C. 298, 86 S.E. 958. *See generally* 17 Am.Jur.2d Contracts §§ 497, 510 (1964); Annot., 164 A.L.R. 1014, 1024 (1946).

17. The fact that Kaufman advised Litteral on January 9, 1967 that he had arranged his financing and would go to settlement was apparently just a repetition of the parties' previous attempt to get settlement and thus does not alter our conclusion. This continuing effort to obtain substitute backers is additional evidence of Capitol's good faith in the matter.