## CIRCUIT COURT OF FAIRFAX COUNTY

Continental Electrical Contractors, Inc.

v.

Cardinal Lighting Company, Inc.

July 18, 1985

Case No. (Law) 66463

By JUDGE THOMAS A. FORTKORT

The case at bar involves a dispute between an electrical contractor, Continental Electrical Contractors, Inc., and an electrical fixture supplier, Cardinal Lighting Company, Inc.

Continental, for at least seven years, has purchased fixtures for various jobs from Cardinal Lighting. The relationship between the parties, while financially beneficial, has not been harmonious. While other disputes have occurred, the central theme seems to have been Continental's habit of paying late although still claiming the discount for timely payment. The amounts in question were small compared to the volume of business between the parties but Continental's failure to adhere to Cardinal's payment schedules had become a major irritant to Cardinal.

This case revolves around two bids for electrical contracts secured by Continental; a job for the American Society of Personnel Administrators and a job for Days Inn Motel. On each job, Continental had received bids from Cardinal which Continental incorporated into a successful low bid for the contract. Cardinal refused to ship fixtures to Continental on a credit basis and Continental

later went to other suppliers to secure the fixtures for the two jobs.

Cardinal claims that Continental was not credit worthy and its refusal to ship fixtures was done to protect Cardinal from loss which Cardinal claims it was entitled to do under Section 8.2-609 of the Uniform Commercial Code.

Continental asserts that Cardinal's withdrawal of credit forced Continental to purchase fixtures from other suppliers at a cost of $24,947.71 over Cardinal's bid price and that it is entitled to collect for these additional costs under Section 8.2-712 of the Uniform Commercial Code.

An electrical sub-contractor begins a contract bid by submitting the job plans and specifications to various fixture suppliers. The supplier submits a bid to the electrical contractor close to the bid day, sometimes within hours of the bid deadline. The electrical contractor then uses the supply bid to formulate its overall bid. If the electrical contractor's bid is accepted, he notifies the supplier. The supplier guarantees its bid to the electrical contractor which the supplier made on bid day.

It is the custom and usage of the trade that supply bids are firm. The electrical contractor may ask the supplier to discount his bid by 5 to 10 percent, but the supplier cannot adjust his bid upward, once made on bid day. The supplier may offer substitution items of like quality which, presumably, the supplier can obtain at a lower price than the specified item. Nevertheless, if the owner or general contractor refuses to accept these substitutions, the supplier will perform at the agreed price. The custom is so strong that Cardinal officials could not recall a case where it had failed to honor its bid day price.

The supplier protects his price with the manufacturer by ordering the fixtures but requiring that the fixtures not be shipped until authorized by the supplier. The manufacturer agrees to hold his price for varying lengths of time which information is passed onto the electrical contractor as part of the supplier's bid. The supplier is required to pledge his line of credit for the items ordered but not shipped. While he may suffer no economic loss, his available credit with the manufacturer is reduced by each job order.

In this case, bid day for the ASPA job was February 3, 1983, and the bid day for the Days Inn job was May 3, 1983.

A quotation form normally follows a successful bid and is a memorialization of the oral bid made by the supplier on the bid date. Quotation forms were submitted by Cardinal on April 20, 1983, for the ASPA job (Plaintiff's Exhibit # 2) and on June 9, 1983, for the Days Inn Motel job (Plaintiff's Exhibit # 3).

On May 9, 1983, Cardinal advised Continental that it would not ship any more fixtures on another job called the Fairlanes job unless Continental brought its account current. Thereafter, Cardinal wrote to Continental on May 31, 1983, specifying certain credit terms for the continuance of business between the firms.

Cardinal maintains that Continental's failure to adhere to this agreement caused Cardinal to suspend Continental's credit. The suspension of credit placed Continental in the position of having to pay cash for the fixtures or purchase them elsewhere. The custom and usage of the trade is to deal on a credit basis. Out of thousands of transactions, Cardinal officers could only recall one cash transaction.

Continental maintains that the May 31, 1983, agreement only applied to future jobs as evidenced by Mr. McAteer's crossing out of the paragraph referring to past indebtedness. Continental further maintains that the sums claimed by Cardinal were inaccurate even after Cardinal removed several thousand dollars worth of charges in a subsequent June billing.

On or about June 9, 1983, Mr. McDonald advised Continental that Cardinal would not ship the fixtures for the two jobs. Continental had forwarded a rejection list from the ASPA job but did nothing on the Days Inn job.

There is evidence that Cardinal underbid the Days Inn job. Continental was told by McDonald that the bid was no good and would have to be revised upward. Continental claimed it was not notified in time to withdraw the Continental bid on the Days Inn job. The evidence in the case favors Continental's position, that it was notified by Cardinal of Cardinal's underbid after Continental had submitted its bid to the general contractor.

The Court, after reviewing all of the above evidence, makes the following findings of fact.

1. A contract existed between the parties wherein Cardinal agreed to supply Continental at the bid day quoted prices, the fixtures for the ASPA and Days Inn jobs.

2. Cardinal never delivered the fixtures.

3. Continental never made a demand on Cardinal to deliver the fixtures after being notified of Cardinal's suspension of Continental's credit.

4. Cardinal suspended Continental's credit on or about June 9, 1983.

5. Continental paid $24,9947 additional for the fixtures for these jobs less $8453 challenged by Cardinal or $16,494.

6. The Court finds such purchases were made in good faith and without unreasonable delay.

7. The Court construes the agreement of May 31, 1983, to apply to future contracts between the parties and therefore finds that Continental did not breach that agreement with Cardinal. It is clear that McAteer did not intend to be bound by that amount alleged to be owed on May 31, 1983, and that he considered that amount in dispute. Additionally, on June 9, 1983, Cardinal adjusted that account and a later law suit gave Cardinal a substantially lesser amount than it asked. The lesser amount is not conclusive that Cardinal's claim was erroneous but is evidence that Continental's complaints about the amount due were well founded.

8. Continental had not paid its bills in the past in accordance with the credit policies of Cardinal.

9. Cardinal had underbid the Days Inn Motel contract with Continental.

As a matter of law, Section 8.2-712 of the Uniform Commercial Code allows Continental to cover Cardinal's failure to deliver by purchasing goods in substitution for those due from the seller, if such substituted purchases are made in good faith and without unreasonable delay as occurred in this case.

The remaining issue and the more difficult to answer is whether the withdrawal of credit by Cardinal was sanctioned by Section 8.2-609 of the Uniform Commercial Code and acts as a bar to Continental's recovery.

The key words in this section are the phrase "[w]hen reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing

demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not received the agreed return."

Under the notes to Section 8.2-609, we find the following commentary:

> Under commercial standards and in accord with commercial practice, a ground for insecurity need not arise from or be directly related to the contract in question. The law as to "dependence" or "independence" of promises within a single contract does not control the application of this present section.

> Thus a buyer who falls behind in "his account with the seller, even though the items involved have to do with separate and legally distinct contracts, impairs the seller's expectation of due performance."

Cardinal under this section had a right to demand that Continental adhere to Cardinal's credit policies as a condition of future shipments.

Virginia adopts the view that this code provision requires that the seller's revocation of credit be because of a "good faith" dissatisfaction with the credit worthiness of the buyer. This position conflicts with the case of *Corn Products Refining Co. v. Fasola*, 94 N.J.L. 181, 109 A. 505 (1920), the case cited in the notes to Section 8.2-609 and by defense counsel. In *Corn Products* the court held that in the seller's sole judgment, if for any reason he was dissatisfied, he was entitled to revoke the credit.

In the case at bar, Cardinal put Continental on notice that it intended to enforce its credit policies strictly in any future dealings with Continental and that the current outstanding balance of $11,062.55 must be paid prior to any shipments. McAteer acknowledged Cardinal's demand but deliberately crossed out the paragraph indicating the outstanding balance needed to be paid prior to any shipments. John McDonald of Cardinal placed his initials next to the crossed-out section indicating his agreement. The parties clearly indicated their intention to be bound by these credit terms in all future dealings.

Nine days later, Cardinal made another demand for the outstanding balance and when Continental did not pay the claim in full, suspended Continental's credit.

The suspension of credit in the custom and usage of this trade was a total suspension of performance. Cardinal's statement that it would deliver on a cash basis was gratuitous since no one in the trade operates on those terms.

Cardinal clearly had a right to demand strict performance of its credit terms as a condition of future deliveries. Cardinal had a right to collect the outstanding balance on the current amount as a condition of further shipments. Cardinal had a right to reject Continental's offer to submit to credit terms on future deliveries only.

However, when Cardinal accepted Continental's counter offer to apply these terms to future deliveries, it created a valid credit understanding. Cardinal's revocation of credit due to the outstanding balance owed by Continental on the current account was contrary to this credit agreement.

The revocation of credit at that time and on the basis on the condition of the current account, which Cardinal had waived, is unreasonable. It represented a change of position, by Cardinal, which change may have been occasioned by its underbid of the Days Inn Motel job. At any rate, Cardinal's revocation of credit was not due to any further defalcation by Continental and is unreasonable under Section 8.2-609 and its Virginia progeny, *Cocoa Products v. Duche*, 156 Va. 86 (1931).

Section 8.2-609 provides a remedy for the seller when he suspects the buyer may be having financial difficulties and its credit may be impaired. In a sense Section 8.2-609 allows the seller to reform the contract by issuing credit terms which were not previously agreed to by the buyer. To avail themselves of this remedy, the proposed credit changes must be in writing. Failure of the buyer to adhere to these new credit terms will allow the seller to refuse shipment and breach the contract. When the seller does breach the contract, he subjects himself to the judgment of the court as to whether his breach was reasonable.

In the case at bar, Cardinal availed itself of Section 8.2-609 and demanded that Continental adhere to specified

credit terms in all future dealings or face suspension of shipments. Although nothing changed in the interim, Cardinal refused to honor its agreement as to future jobs and refused to ship on the basis of the currently delinquent account, although it had agreed not to apply the credit terms to that outstanding balance.

It is the position of this Court, that when a seller avails himself of the right to rescind shipment on the basis of Section 8.2-609, then the seller must adhere to its own credit agreement. Failure to adhere to the new credit terms by the seller is, in itself, an unreasonable withholding of credit and the seller, when it refuses to ship, breaches the contract between the parties.

The buyer when a contract is breached may cover by purchasing goods elsewhere under 8.2-712 provided he does so within a reasonable period of time. It is unclear whether the time mentioned is at the time of breach or when the original contract was scheduled to be performed.

Regardless, there is no evidence that the Plaintiff Continental did not act within a reasonable period of time in securing fixtures from other suppliers.

The Court renders judgment in favor of the Plaintiff in the amount of $16,494; interest to run at the legal rate from the date of this order.