**PROTEUS BOOKS LIMITED, Plaintiff–Appellant, Cross–Appellee,**

v.

**CHERRY LANE MUSIC COMPANY, INCORPORATED, Defendant–Appellee, Cross–Appellant.**

**Nos. 314, 404, Dockets 88–7555, 88–7609.**

United States Court of Appeals, Second Circuit.

Argued Nov. 17, 1988.

Decided March 27, 1989.

---

Karen Shatzkin (Bernard Ouziel, Shatzkin & Reiss, New York City, of counsel), for plaintiff-appellant, cross-appellee.

Gideon Cashman (Philip R. Hoffman, Pryor, Cashman, Sherman & Flynn, New York City, of counsel), for defendant-appellee, cross-appellant.

Before LUMBARD, MESKILL and KEARSE, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal and cross-appeal from a judgment of the United States District Court for the Southern District of New York, Carter, J., in an action based on a contract executed in 1983 by plaintiff-appellant-cross-appellee Proteus Books Limited (Proteus) and defendant-appellee-cross-appellant Cherry Lane Music Co. (Cherry Lane). Under the contract, Cherry Lane was to distribute Proteus' books to music, book and record stores. Jurisdiction is premised on diversity; the parties agree that the contract is governed by New York law. The decision of the district court is published at 688 F.Supp. 877 (S.D.N.Y. 1988).

Proteus filed suit against Cherry Lane in 1985, alleging ten counts, four of which are

at issue on appeal. The four counts, in the order in which they were presented to the jury, are: first, that Cherry Lane breached its contractual standard of care; second, that Cherry Lane breached an oral agreement to pay Proteus by bills of exchange; third, that Cherry Lane breached a minimum sales agreement; and fourth, that Cherry Lane converted Proteus' inventory. The jury returned a verdict for Proteus on each of these claims, awarding $2,851,411 damages on the first, $317,731 on the second, $120,000 on the third, and $177,000 on the fourth; the total award on these claims was thus close to $3.5 million. Cherry Lane moved for judgment notwithstanding the verdict on each claim; the district court granted the motion as to the first two counts, and denied it as to the second two. Proteus appeals the grant of judgments n.o.v. and Cherry Lane appeals the denial of judgments n.o.v.- In addition, Proteus urges that, in the event of a remand, various evidentiary rulings made by the district court be overturned.

We affirm in part, vacate in part, and remand.

## BACKGROUND

### A. The Parties

In January 1977, Michael Brecher founded a British company called Proteus (Publishing) Limited (PPL). PPL published books, at first in no one particular subject matter, but later, primarily in the film and rock and roll music fields. After six years in business, PPL went into receivership and folded. Brecher, however, believed a new company could be successful if it concentrated solely on publishing books about film stars and rock and roll music. To assist him in developing his new venture, Brecher contacted Michael Shatzkin, who had worked with PPL, and who Brecher believed could help with North American distribution and financial support. It was Shatzkin who introduced Brecher to Cherry Lane.

Brecher's new company, Proteus, was developed in 1983, from the remains of PPL. Proteus acquired the rights to the books that had been published by PPL. How-ever, these books had never sold well in America. Even with an inventory of these books and the new ones that it developed, the new Proteus was not able to survive. It filed for liquidation in 1985.

Cherry Lane was an established operation in 1983, when the contract at issue was signed. Its parent company, Cherry Lane Music Publishing Co. (Cherry Lane Music) had been founded twenty-five years earlier; Cherry Lane itself had been started in 1976. Cherry Lane Music owned music copyrights; Cherry Lane published sheet music and collections of music. In 1981, Cherry Lane published its first music trade book. By the time Cherry Lane signed the contract with Proteus, it had published several other trade books as well. Lauren Keiser, Cherry Lane's president, led the drive to expand Cherry Lane's business into trade books. By 1985, Cherry Lane's Marketing and Sales Director, Ed Cimino, claimed that Cherry Lane was "the largest rock book publisher and distributor in the world." Nevertheless, Cherry Lane's experience in this type of distribution was limited; it had been distributing such books for only a few years—about the same amount of time Proteus had been publishing them.

### B. The Relationship Between Proteus and Cherry Lane

Through Shatzkin, Cherry Lane and PPL reached an agreement in September 1982 for Cherry Lane to distribute Proteus' books to music and record stores. This agreement was to last for one year, and is not at issue. On its heels, however, came the first of the agreements that are at issue: the contract signed September 30, 1983 between Proteus (by Brecher) and Cherry Lane (by Keiser), which was to take effect January 1, 1984.

#### 1. *The September 1983 Contract*

This contract was negotiated in the summer of 1983, primarily by Brecher, who had been trained as an attorney in England, and Keiser, a layman who apparently did not consult an attorney on Cherry Lane's behalf. Although the contract provided

that it could be re-drafted by an attorney, this was never done. The first draft of the contract was prepared by Brecher, but the final version was a product of give and take between the parties.

The contract provided, *inter alia*, that Cherry Lane was to perform distribution services for Proteus to American book, music and record stores and was to do so with "due professional skill and competence." The term of the agreement was three years, with a one or two year option for renewal. If, however, Cherry Lane were to achieve an average of 3,500 copies sold per Proteus book, the agreement would be automatically extended. Cherry Lane's basic commission was to be twenty-four percent.

The contract also called for Cherry Lane to assist Proteus in its start-up financing. Although Cherry Lane's services to Proteus were not to begin until January 1, 1984, on November 1, 1983 it was to begin issuing "guarantees to Proteus' production suppliers or firm purchase orders for [Proteus'] inventory" at Proteus' request. While Cherry Lane would be the maker of these guarantees or purchase orders, it was Proteus' responsibility to see that its production bills were paid, thereby discharging Cherry Lane's guarantees. If Proteus failed to pay its bills, or to make adequate assurances to Cherry Lane that its bills would be paid, Cherry Lane could withhold from Proteus money from sales in any month an unpaid guarantee fell due. In that event, Cherry Lane would also have a lien on money owed to Proteus. Furthermore, although Cherry Lane was under no obligation to issue purchase orders to Proteus beyond October 31, 1984, it would continue to maintain its right to deduct money owing on purchase orders from money it otherwise owed Proteus. Similarly, as long as any Cherry Lane guarantee was outstanding, Cherry Lane had a lien on inventory covered by the guarantee. Finally, the parties provided that if the agreement were ever terminated, Proteus would have to "settle" all outstanding purchase orders, and that Cherry Lane would have a lien on money due Proteus until such purchase orders were settled.

### 2. *The Amendments: Alternate Financing Provisions*

Proteus soon found that Cherry Lane's guarantees and purchase orders were not adequate for it to raise sufficient capital to begin production. Therefore, on May 3, 1984, Cherry Lane and Proteus amended the contract to provide that Cherry Lane would issue purchase orders directly to Proteus' printers in the United Kingdom. Cherry Lane would thus be bound by a contract to the printer to pay the purchase order when it came due. Cherry Lane and Proteus agreed that Cherry Lane would pay these purchase orders within 120 days of delivery of the books to Cherry Lane, but that Proteus' deadline for paying Cherry Lane for the purchase orders was thirty days earlier, *i.e.*, within ninety days of delivery. If Proteus failed to pay an invoice pertaining to a Cherry Lane purchase order, Cherry Lane could withhold from Proteus any money it owed Proteus, until it had recovered an amount sufficient to pay the purchase order.

Apparently, at about the time the parties signed this amendment, Cherry Lane orally agreed to make some payments to Proteus by bills of exchange. The bills of exchange could be converted into ready cash by Proteus through a factoring company, International Factors Limited (IFL). In August 1984, Proteus returned three purchase orders to Cherry Lane in exchange for bills of exchange issued by Cherry Lane for $26,000.

Cherry Lane issued purchase orders under the May 3 agreement to Blantyre Printing & Binding Co. Ltd. (Blantyre), Proteus' printer in Scotland, but Proteus did not pay Cherry Lane for the invoices, and Blantyre billed Cherry Lane directly. Cherry Lane re-directed the invoices to Proteus, but Blantyre informed Cherry Lane that it expected payment from Cherry Lane, as it was Cherry Lane, and not Proteus, which had entered the purchase order contract with Blantyre. Cherry Lane once again directed Blantyre to Proteus, but Blantyre sued Cherry Lane for payment. Cherry

Lane eventually wired more than $91,000 to Blantyre in settlement.

As Cherry Lane was encountering these difficulties, it received a letter from Brecher announcing that he was unhappy with Cherry Lane's sales, but that he was "optimistic" about Cherry Lane's future performance. Despite Cherry Lane's problems with Blantyre and Proteus' displeasure with Cherry Lane, the parties extended their contract for one year on March 29, 1985. They also agreed that from April 1, 1985 to October 1, 1985, Cherry Lane would guarantee to Proteus gross sales of $85,000 per month, and that Proteus would guarantee delivery of four new titles in the first half of each month to Cherry Lane.

### 3. *Termination of the Contract*

Soon after this, in May 1985, Cherry Lane dishonored two bills of exchange it had issued to Proteus and that Proteus had discounted with IFL. These bills totaled approximately $20,000. The bills were due on May 15, 1985, but when IFL presented them for payment, it was notified that Cherry Lane had dishonored them. IFL therefore halted its payments to Proteus. Four weeks later, IFL released approximately half of the money to Proteus, and the other half was released on June 19, one week after the first payment. IFL released this money because Cherry Lane had decided to honor the bills.

By the time Cherry Lane honored the bills, however, Proteus had already terminated the contract with Cherry Lane. On June 7, 1985, Proteus sent a letter to Cherry Lane informing Cherry Lane that it considered Cherry Lane to be in material breach of the contract and that Proteus was no longer bound by it. Proteus filed suit against Cherry Lane in the Southern District of New York June 24, 1985; trial was held more than two years later. The jury awarded damages totaling almost $3.5 million on four of Proteus' claims. Cherry Lane moved for judgment n.o.v. on each claim. The district court granted the motion on the first two counts and denied the others. The district court's decision was filed June 6, 1988.

### C. The District Court's Decision

In granting judgment n.o.v. to Cherry Lane on Proteus' first claim, that it had breached its duty to perform with due professional skill and competence, the district court held that "[t]he jury clearly disregarded the court's instructions" on this count. 688 F.Supp. at 881. Instructions had been given to the jury to construe the phrase "due professional skill and competence" most favorably to Cherry Lane, as it was ambiguous as a matter of law. *Id.* The district judge believed that under this standard, the jury could not find in favor of Proteus, and therefore reversed its award. The court reached its decision, in part, based on the contract's integration clause, which the court read to preclude extrinsic evidence of the meaning of "due professional skill and competence." *Id.* at 882. In addition, the court agreed with Cherry Lane that Proteus, by extending the contract on March 29, 1985, had waived any claim based on wrongdoing by Cherry Lane prior to that date. *Id.* Finally, it held that, in any event, the jury's damage award could not be upheld as it was "highly speculative." *Id.* at 883.

On the second count, the claim based on the allegation that Cherry Lane breached an oral agreement to pay Proteus by bills of exchange, the district court also granted j.n.o.v. to Cherry Lane. The judge found that, first, Proteus was not entitled to consequential damages, but only interest, and that the damage award therefore could not stand. Second, the judge held that even if consequential damages could be recovered, the damage to Proteus in this case was not reasonably foreseeable to Cherry Lane at the time the contract was made, and therefore Proteus could not recover for its loss. *Id.*

The final two claims were not set aside by the district court because Judge Carter held that to do so "would constitute an intolerable usurpation by the court of the jury's function." *Id.*

### DISCUSSION

#### A. Standard of Review

■ We apply the same standard of review to both the grant and the denial of

judgments n.o.v. A trial court may grant or deny a j.n.o.v. if the evidence leads to only one reasonable conclusion when the witnesses' credibility and the weight of the evidence are not taken into account. *See Ebker v. Tan Jay International, Ltd.*, 739 F.2d 812, 825 & n. 16 (2d Cir.1984). Review of the district court's decision is *de novo:* if the jury's verdict was reasonable taking the evidence in the light most favorable to the non-moving party, a grant of j.n.o.v. is improper, *see id.;* only if the jury's verdict was unreasonable taking the evidence in the light most favorable to the non-moving party is a grant of j.n.o.v. proper, *see Auwood v. Harry Brandt Booking Office, Inc.*, 850 F.2d 884, 889 (2d Cir.1988).

**B. Breach of Duty to Perform with Due Professional Skill and Competence**

 Proteus claims that Cherry Lane breached its duty, set forth in the contract, to perform its services with "due professional skill and competence."[1] Cherry Lane argues that this phrase is ambiguous to the point of being "void for vagueness." By its reasoning, it could not have been in breach as it had no enforceable duty to Proteus. It adds that, even if there had been a duty, Proteus waived its right to a remedy by extending the agreement.

The judge charged the jury on several specific points relating to this claim. He told the jury that for the phrase "due professional skill and competence" to have been unambiguous, there must have been a mutual understanding between the parties as to its meaning. He added that as a matter of law such a meeting of the minds did not exist. Thus, the phrase was ambiguous and had to be construed most narrowly against Proteus, which had authored the phrase. *See* 688 F.Supp. at 881.

Although the judge correctly instructed the jury on the question of ambiguity, the charge was erroneous to the extent it discussed a meeting of the minds. The concept of a meeting of the minds goes not to ambiguity, but to the very existence of the contract. *See* 1 S. Williston, *A Treatise on the Law of Contracts* §§ 1, 22 (3d ed. 1957 & Supp.1988); *see, e.g., Aces Mechanical Corp. v. Cohen Brothers Realty & Construction Corp.*, 136 A.D.2d 503, 505, 523 N.Y.S.2d 824, 827 (1st Dep't), *corrected*, 531 N.Y.S.2d 218 (1988). This is not a case where no agreement existed as to an essential term. *See, e.g., Aces Mechanical*, 136 A.D.2d at 505, 523 N.Y.S.2d at 826–27 (no present intent to enter a contract); *Four Seasons Hotels Ltd. v. Vinnik*, 127 A.D.2d 310, 317, 321, 515 N.Y.S.2d 1, 6, 9 (1st Dep't 1987) (agreement necessary only on material terms); *Blakey v. McMurray*, 110 A.D.2d 998, 999, 488 N.Y.S.2d 286, 287–88 (3d Dep't 1985) (terms of a mortgage pursuant to a land sale contract not established); *Maurice B. Cunningham, Inc. v. Denckla*, 96 A.D.2d 580, 580, 465 N.Y.S.2d 273, 274 (2d Dep't 1983) (no agreement as to either a commission in a brokerage contract or proposed additional terms to the contract) (mem.). The parties here clearly agreed to the contract's essential terms, including that it was to be performed with due professional skill and competence. The question is what level of performance was sufficient to meet that standard.

Cherry Lane's contention that the contract is unenforceable because the phrase "due professional skill and competence" is vague is unavailing. To void a contract for vagueness is a last resort, *Young v. Zwack, Inc.*, 98 A.D.2d 913, 914, 471 N.Y.S. 2d 175, 177 (3d Dep't 1983) (mem.), and in this case reference to external, ascertainable standards imparts a reasonable degree of certainty to the meaning of the phrase, *compare id.* at 915, 471 N.Y.S.2d at 177 (meaning of defendant's promise to "cover" additional costs ascertainable), *and Four Seasons Hotels*, 127 A.D.2d at 317–18, 322, 515 N.Y.S.2d at 6, 9–10 (reference to commercial practice or usage and custom may be had to determine meaning of non-essential term), *with Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 110–11, 417 N.E.2d 541, 544, 436 N.Y.S.2d

---

**1.** In the alternative, Proteus maintains that Cherry Lane breached an implied covenant of fair dealing and good faith. We do not reach this claim due to our disposition of the due professional skill and competence claim.

247, 249-50 (1981) (amount of rent to be paid not ascertainable where no method for determining rent in contract), *and Mocca Lounge, Inc. v. Misak*, 94 A.D.2d 761, 763, 462 N.Y.S.2d 704, 706-07 (2d Dep't 1983) (saying in dicta that best efforts clause unenforceable unless contract contains standards by which to measure party's performance) (mem.). While a contract may not be impenetrably vague and uncertain, *Joseph Martin, Jr.*, 52 N.Y.2d at 109, 417 N.E.2d at 543, 436 N.Y.S.2d at 249, on these facts, "due professional skill and competence" is not impermissibly vague.

In this case, it is not fatal that the contract does not define the standards of due professional skill and competence. Reference to the managerial and marketing standards of the book publishing and distribution industries is sufficient to make the phrase readily understandable. A list of the acts that would constitute due professional skill and competence was therefore not necessary, unlike the situation in *Mocca Lounge*, where the court noted that a party's "best efforts," a patently subjective standard, had to be defined to be enforced. 94 A.D.2d at 763, 462 N.Y.S.2d at 706-07. Cherry Lane agreed that the phrase "due professional skill and competence" meant it was to perform its duties "competently," but Proteus and Cherry Lane presented conflicting evidence as to the industry standard of marketing competence. This is the heart of the dispute: Proteus contends competency required Cherry Lane to do more than it did and Cherry Lane says its performance was competent.

It is clear that Judge Carter was correct in holding that the phrase was ambiguous as a matter of law. *See Schmidt v. Magnetic Head Corp.*, 97 A.D.2d 151, 156, 468 N.Y.S.2d 649, 653 (2d Dep't 1983) (question of ambiguity is for court). The interpretation of the phrase was therefore a question for the jury. *Citizens Central Bank v. Fisher*, 126 A.D.2d 968, 969, 511 N.Y.S.2d 743, 743 (4th Dep't 1987) (mem.). The jury, however, was constrained to construe the phrase most strongly against Proteus, its author. *Jacobson v. Sassower*, 66 N.Y.2d 991, 993, 489 N.E.2d 1283, 1284, 499 N.Y.S.2d 381, 382 (1985) (mem.). Judge Carter

properly included this instruction in his charge.

▮▮▮ Despite the instruction to interpret the phrase in the light most favorable to Cherry Lane, the jury returned a verdict for Proteus on this count. The district court granted Cherry Lane's motion for j.n.o.v. for several reasons. First, it said there was no meeting of the minds as to the meaning of "due professional skill and competence" or the standard by which to measure that skill and competence. However, as discussed above, while the phrase was ambiguous, there was no absence of a meeting of the minds. Therefore, this reason did not justify granting Cherry Lane judgment n.o.v.

The district court also stated that Cherry Lane showed several factors other than its own performance that may have contributed to Proteus' poor sales. These, Judge Carter said, were sufficient to show that, when the phrase was construed most favorably to Cherry Lane, lack of competence was not established. 688 F.Supp. at 881. That evidence existed which indicated that any one of several factors could have caused slow sales of Proteus' books, however, is not probative of the issue of competence. It also does not negate the evidence Proteus introduced relating to standards of competence in marketing and sales techniques. It would not be inconsistent for the jury to find that Cherry Lane was incompetent but that other factors existed that led to Proteus' downfall. The jury may have done just that in awarding less than the damages claimed. The district court's reasoning here also does not warrant granting the judgment n.o.v.

Third, the district court held that because the contract contained an integration clause, extrinsic evidence could not be considered to resolve the ambiguity. It is true that extrinsic evidence cannot be admitted to prove different or additional terms in an integrated contract, but it may be admitted to aid in interpreting ambiguous terms of an integrated contract. *Verstandig & Sons, Inc. v. Sobel*, 26 Misc.2d 649, 652, 206 N.Y.S.2d 860, 863-64 (N.Y.Sup.Ct.N.Y.

Cty.1960); 4 S. Williston, *supra*, § 631; Restatement (Second) of Contracts § 212 (1979). Thus, the jury was entitled to consider the evidence presented by both parties as to the meaning of "due professional skill and competence." It was, of course, constrained by law to construe the phrase most favorably to Cherry Lane. On the record presented to us, we cannot say that there was insufficient evidence for the jury to determine, as it did, that Cherry Lane's evidence on the meaning of competence was completely incredible and that Proteus' was credible. As the jury was properly instructed on the rules of construction, and as it is not clear that there was only one possible interpretation of the evidence, the j.n.o.v. should not have been granted on this ground.

The district court also gave credence to Cherry Lane's argument that Proteus waived its right to any remedy for breaches that occurred prior to March 29, 1985. Proteus did introduce evidence that it had reserved its rights with Cherry Lane. Even if the jury did not credit this evidence, Proteus' communication of its dissatisfaction to Cherry Lane before it extended the contract can be construed as notice of breach. The extension would then not be a significant factor if the jury found that Proteus was not abandoning its claim, but trying to mitigate its losses. *Sklarsky v. Wayne Lawrence Construction Corp.*, 28 Misc.2d 391, 393, 219 N.Y.S. 2d 733, 735 (N.Y.Sup.Ct.Nassau Cty.1961) ("In the absence of agreement to the contrary, mere delivery and acceptance of a deed would not necessarily waive a breach of the building contract."); *see also Filmline (Cross–Country) Productions, Inc. v. United Artists Corp.*, 865 F.2d 513, 517–18 (2d Cir.1989). Hence, the waiver argument does not entitle Cherry Lane to judgment n.o.v.

▮ We agree with Judge Carter that the jury's damage award to Proteus on this claim was unreasonable and unfounded. Proteus had been in existence for only two years when it filed its suit against Cherry Lane and its sales performance in the United States had been consistently poor.

These factors would make it difficult to assess damages based on future earnings no matter what, but the jury was given little guidance as to what it should have, and should not have, considered in making its assessment. Especially in the entertainment business, where there are "inherent uncertainties [in] predicting profits," *Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 263, 493 N.E.2d 234, 236, 502 N.Y.S.2d 131, 133 (1986) (per curiam), there must be sufficient evidence and the jury must be so instructed that there is no room for wild speculation, *see Ciraolo v. Miller*, 138 A.D. 2d 443, 444, 525 N.Y.S.2d 861, 862 (2d Dep't 1988) (mem.).

In this case, the jury's award is not supported by the evidence. Unlike the circumstances in *For Children, Inc. v. Graphics International, Inc.*, 352 F.Supp. 1280 (S.D. N.Y.1972), there is no clear indication here that the amount of prospective profits was contemplated by the parties at the time the contract was signed. *See id.* at 1284 & n. 16. Furthermore, given the failure of Proteus' predecessor company and Cherry Lane's relative inexperience in the book distribution business, Proteus has not proved with reasonable certainty a basis for anticipation of profits in the amount awarded by the jury.

According to royalty reports Proteus submitted in evidence, Proteus never received more than $49,386.80 in one month from American sales of its books, and the average monthly amount earned was approximately $23,000. With the original three year term of the contract, plus the one year extension, however, even if Proteus had realized $50,000 profit each month, it still would not have equaled the award granted by the jury. Furthermore, Proteus' summary of its own damages finds little basis in fact. Damages may only be awarded in this case to the extent that a reasonable basis exists for assessing lost profits. *Kenford Co.*, 67 N.Y.2d at 261, 493 N.E.2d at 235–36, 502 N.Y.S.2d at 132. To the extent that the award exceeds the amount Proteus showed was lost with reasonable certainty, it is excessive.

Proteus has not shown that the award was based on profits that could be reasonably anticipated. The tremendous gaps in the factual foundation convince us that the jury's verdict was speculative. Therefore, we vacate the judgment n.o.v. as to liability on the breach of contract claim for failure to exercise "due professional skill and competence" and remand this matter to the district court for a re-trial on the issue of damages.

## C. The Bills of Exchange Agreement

■ Proteus argues that Cherry Lane breached its agreement to pay Proteus by bills of exchange when it dishonored the bills Proteus had discounted with IFL.[2] The district judge noted that the existence of the agreement was in dispute, 688 F.Supp. at 883, but the jury obviously found Proteus' evidence of the agreement's existence to be credible and we will not overturn that factual finding.

The agreement apparently called for Cherry Lane to make its bills payable to Proteus, which would endorse the bills to IFL. IFL would then present them for payment. In its amended complaint, Proteus alleged the wrongful dishonor of one bill of exchange. Cherry Lane drew the court's attention to this in its own papers, but the court instructed the jury on both bills dishonored on May 15, 1985. Indeed, in its summation, Cherry Lane addressed both bills. We therefore proceed, as did the district court and the parties, as if the complaint conformed to the proof offered. *See* Fed.R.Civ.P. 15(b).[3]

Cherry Lane argues that its dishonor of the bills was not wrongful under the terms

of the May 3, 1984 amendment to the contract. This amendment's sole paragraph states, in part:

If Proteus fails to pay the invoice related to the purchase order within 90 days after the delivery to Cherry Lane's Port Chester warehouse, then Cherry Lane shall have the right to withhold from Proteus any monies that it might owe to them until it has recovered sufficient funds to reimburse Cherry Lane for payments it is required to make pursuant to the purchase order.

For Cherry Lane to succeed on its defense, it must have shown that it issued a purchase order to Blantyre, that Proteus failed to pay Cherry Lane the amount of the invoice within ninety days of the delivery of the books related to the purchase order, and that it did not withhold the money from Proteus for a period of time longer than it took to recover sufficient funds to cover the purchase order.

Invoices addressed to Cherry Lane from Blantyre were introduced at trial showing that Cherry Lane had been billed for purchase orders on September 18, 1984; September 29, 1984; October 31, 1984; November 30, 1984; and January 14, 1985. On March 15, 1985, Blantyre sent Ed Cimino a telex stating that the September and October invoices had not been paid and proposing a schedule for payment of those and other invoices. Proteus does not dispute that it had not paid Blantyre, but asserts that Blantyre had breached its contract with Proteus, and that therefore Blantyre was not entitled to payment. Blantyre's terms to Cherry Lane were 120 days from delivery; Proteus was to pay Cherry Lane

---

**2.** Proteus is not suing on the bills, although upon dishonor an action may be maintained either on or off the instrument under the Uniform Commercial Code. *Burnett v. Vance,* 126 Misc.2d 402, 404, 483 N.Y.S.2d 595, 597 (N.Y. Sup.Ct.Queens Cty.1984) (citing N.Y.U.C.C. § 3–802(1)(b) (McKinney 1964)). Thus, this action is governed by the terms of the agreements between Proteus and Cherry Lane, and not by the U.C.C.

**3.** This is not a case where an amendment would be necessary to confer subject matter jurisdiction upon the court, *see Christianson v. Colt Industries Operating Corp.,* — U.S. —, —,

108 S.Ct. 2166, 2176, 100 L.Ed.2d 811 (1988). The dishonor of both bills of exchange was an issue tried by the implied consent of Proteus and Cherry Lane, and therefore was properly treated by the district court as if it had been raised in the pleadings. *See* Fed.R.Civ.P. 15(b); *see also Luria Brothers & Co. v. Alliance Assurance Co.,* 780 F.2d 1082, 1088–90 (2d Cir.1986). Cherry Lane fully responded to Proteus' claims on both bills and, although aware of the inconsistency in Proteus' complaint, did not raise this issue on appeal. There is therefore no reason not to treat both bills of exchange as having been properly alleged in the complaint.

within ninety days of delivery. By May 15, when the dishonor occurred, the September, October, November and December invoices were past the 120 day deadline, the January invoice was past the ninety day deadline, and Proteus had not paid Cherry Lane for any of these.

The five invoices total $20,337 plus 69,901.61 pounds, which at the parties' stipulated rate of exchange for 1985 is an aggregate of about $110,000. Cherry Lane settled this debt with Blantyre in late 1985 and early 1986. There is no allegation anywhere that Proteus ever paid Cherry Lane or Blantyre the amount due under these invoices.

Thus, when Cherry Lane dishonored the two bills, totaling approximately $20,000, Proteus had failed to pay Cherry Lane for money due on purchase orders Cherry Lane had issued to Blantyre more than ninety days earlier, totaling $110,000. The May 3, 1984 agreement applies to Cherry Lane's dishonor, and therefore Cherry Lane had a right to withhold the $20,000 from Proteus to protect itself with respect to the $110,000 Blantyre claimed was due. That Cherry Lane later was somehow satisfied that Blantyre would be paid, and therefore decided to honor the bills, does not affect its rights under the May 3, 1984 agreement. *See Newfield v. General Motors Corp.,* 84 A.D.2d 548, 549, 443 N.Y. S.2d 239, 241 (2d Dep't 1981) (existence of second reason for termination of contract irrelevant to validity of first) (mem.), *aff'd,* 56 N.Y.2d 818, 438 N.E.2d 103, 452 N.Y. S.2d 570 (1982); *see also Big Horn Coal Co. v. Commonwealth Edison Co.,* 852 F.2d 1259, 1270 (10th Cir.1988) (invalid reason for termination of contract does not nullify valid reason); *Loma Linda University v. District–Realty Title Insurance Corp.,* 443 F.2d 773, 779 (D.C.Cir.1971) (same).

The judgment n.o.v. on this claim is therefore affirmed.

## D. The Minimum Sales Agreement

Cherry Lane's first claim on appeal is that the jury's verdict for Proteus on Proteus' claim that Cherry Lane breached the March 29, 1985 agreement guaranteeing Proteus sales of $85,000 per month for six months should be overruled. The first two paragraphs of this agreement provide:

1) Starting April 1, 1985 for six (6) months inclusive Cherry Lane will guarantee sales of $85,000.00 gross to Proteus.

2) Proteus guarantees four (4) new titles per month on a timely basis, which our agreement is mutually agreed upon titles [sic]. This delivery will take place in the first half of the month.

Cherry Lane argues, however, that Proteus did not deliver the required books on time each month and that Cherry Lane therefore did not have to guarantee minimum sales of $85,000. It alleges that the books delivered in the second half of any month were not to count toward the totals of either the month in which they were delivered or the next month. As some of Proteus' books were delivered in the second half of April, Cherry Lane asserts Proteus was in breach.

Paragraph two of the agreement calls for Proteus to deliver the books "timely" and "in the first half of the month." Taken together, these terms create an ambiguity in this provision that properly was resolved by the jury. Proteus elicited testimony to support its contention that the parties never agreed that books delivered after the first half of a month would not count toward the next month's titles. The jury was entitled to believe that Cherry Lane's interpretation of the agreement, which held books delivered after the first half of the month to be "extras," was not in accordance with the understanding of the parties. Instead, it could have found that Proteus' interpretation, that books scheduled for production in a certain month could be sent before their scheduled delivery dates, was the essence of the parties' agreement.

Under this interpretation, obviously adopted by the jury, books due one month that were delivered before they were due were "timely." Thus, the jury could have concluded that books delivered in late

March and April 1985 satisfied Proteus' obligations for the months of April and May, respectively, and that Proteus therefore did not breach its part of the agreement. We cannot say that this interpretation is unreasonable or unsupported by the evidence.

■ Cherry Lane claims, however, that Proteus did not prove its damages, which the jury found to be $120,000. The jury had before it sufficient evidence to support its award. After deducting Cherry Lane's commission of twenty-four percent, Proteus was entitled to $64,600 in each month it delivered four books on time. Thus, in both April and May, Proteus was entitled to this amount, a total of $129,200. Cherry Lane did pay Proteus $47,175 of this amount, leaving $82,025 owing to Proteus. Proteus could also be entitled to damages relating to future performance. As Proteus was justified in terminating the contract, *see supra*, it was entitled to lost profits caused by Cherry Lane's breach, if they could be determined with some degree of certainty. In making its award under the minimum sales agreement, the jury could consider future books to be delivered by Proteus and Proteus' profits therefrom. This is so because the amount of guaranteed sales was clearly stated in the agreement and not subject to speculation. If Proteus had delivered four timely books in each of the four succeeding months, it would have been entitled to receive $340,-000 from Cherry Lane ($85,000 × 4), almost three times what the jury awarded. Even at thirty-eight percent of the total amount, which is the percentage Proteus used to calculate its profits, Cherry Lane would have owed Proteus $129,200 for June–September. When added to the $82,-025 owed from April and May, this amount is also more than the $120,000 figure awarded by the jury.

Therefore, while Cherry Lane is correct in its assertion that it could withhold money due Proteus on account of the outstanding purchase orders issued to Blantyre, we note that this amount was never more than $110,000 at any time, and that Cherry Lane asked the jury to consider this setoff on more than one claim. We cannot say it was unreasonable for the jury to consider that after this setoff, Proteus would still have been entitled to damages of $120,000 for lost profits from Cherry Lane's breach of its guarantee. The district court was therefore correct in denying judgment n.o. v. on this claim.

E. Conversion

■ Cherry Lane's second claim is that judgment n.o.v. should have been granted on the jury's award of damages to Proteus on Proteus' conversion claim. Cherry Lane's argument on this point fails as well. The contract gave Cherry Lane a lien on Proteus' inventory in two circumstances: upon termination of the agreement if Proteus had not settled the amounts due on outstanding purchase orders issued to Proteus, and as long as Cherry Lane's guarantees were outstanding. The May 3, 1984 agreement relating to the purchase orders issued to Proteus' printers did not give Cherry Lane a lien on Proteus' inventory: it only allowed Cherry Lane to withhold money.

Cherry Lane alleges, however, that the debt to Blantyre can be used as a setoff against this claim, and that it entitled Cherry Lane to a lien on Proteus' inventory. However, the debt to Blantyre did not allow Cherry Lane to hold Proteus' inventory. The Blantyre purchase orders were not covered by the original contract: that is why the contract was amended. Nor were the Blantyre purchase orders the equivalent of guarantees. Cherry Lane's only remedy against Proteus under the May 3 agreement was to withhold money. It did not have a contractual lien on Proteus' inventory and thus Cherry Lane's position on this issue is meritless.

Cherry Lane also urges that it has a common law lien on Proteus' inventory. Proteus contends that we need not reach this question, as no charge was given to the jury on the common law of liens, and Cherry Lane did not object to the charge that was given. Cherry Lane did request such a charge, but, as Proteus points out, it

did not object when the court did not so instruct the jury.

 The procedures relating to jury instructions are governed by federal law in a diversity case. *Ulmer v. Associated Dry Goods Corp.*, 823 F.2d 1278, 1284 n. 3 (8th Cir.1987). Fed.R.Civ.P. 51 states that "[n]o party may assign as error ... the failure to give an instruction unless that party objects thereto ..., stating distinctly the matter objected to and the grounds of the objection." Therefore, unless the failure to charge was plain error, we cannot review Cherry Lane's claim on appeal. *See Kelco Disposal, Inc. v. Browning–Ferris Industries*, 845 F.2d 404, 409 (2d Cir.1988), *rev'd on other grounds*, 57 U.S.L.W. 4985 (U.S. June 26, 1989.); *Schaafsma v. Morin Vermont Corp.*, 802 F.2d 629, 635–36 (2d Cir.1986).

This is not a case like *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 921–22, 99 L.Ed.2d 107 (1988) (plurality opinion), where the significance of a question of law mandated that the Supreme Court reach an issue, even though there had been no objection to the jury charge on the subject. *Praprotnik* addressed the question whether state law determines who may be sued as a policymaker in suits brought under 42 U.S.C. § 1983 (1982) or whether that is a question of fact for the jury. In contrast, Cherry Lane's common law lien claim involves a question of fact that is peculiar to the contract at issue in this case. None of the policies present in *Praprotnik* that urged a liberal construction of Fed.R.Civ.P. 51 is present here. We therefore review Cherry Lane's claim for plain error. *See Parker v. District of Columbia*, 850 F.2d 708, 715–16 (D.C.Cir. 1988), *cert. denied*, ─── U.S. ───, 109 S.Ct. 1339, 103 L.Ed.2d 809 (1989).

While the omission of a charge on an alternate theory of recovery may be considered plain error, *cf. Schaafsma*, 802 F.2d at 635–36 (omission of remedy of rescission on jury interrogatory form plain error, as judge did charge jury on rescission), it was not plain error in this instance. Not only did Cherry Lane not object to the failure to charge on a common law lien theory, but in its answer to Proteus' complaint, Cherry Lane only pled a defense of a contractual lien on Proteus' inventory; it made no mention of a common law lien. The district court's failure to charge the jury on a common law lien theory was not plain error.

F. Proteus' Requests on Remand: Evidentiary Rulings

Proteus has asked that, on remand, it be allowed to present expert testimony from two persons, Stiles and Turner, on the saleability of its books. The district court had refused to let these two witnesses testify as experts on this subject. Proteus also argues that certain documents were wrongly excluded, that Shatzkin should have been qualified as an expert witness, and that Keiser's successor as president of Cherry Lane should have been allowed to testify to statements made to him by Cherry Lane's owners, as such statements were party admissions.

 We now turn to the evidentiary rulings of the district court about which Proteus complains and which may surface again on the retrial of damages. We will not disturb the evidentiary rulings of a trial judge unless they are "manifestly erroneous." *In re Martin–Trigona*, 760 F.2d 1334, 1344 (2d Cir.1985) (quoting *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962)). Judge Carter's decision to exclude the testimony of Stiles and Turner was not manifestly erroneous. Their testimony would merely have been speculation as to sales of Proteus' books, when neither had personal knowledge of the saleability of the books. While the decision may have been a close one, *see id.* at 1345, especially in light of Proteus' attempt to admit the testimony in question as that of experts, we cannot say that the district court was wrong in excluding this testimony. Although expert witnesses may base their testimony on facts other than personal knowledge, the "facts" underlying the proffered testimony of Stiles and Turner were only the existence and nature of Proteus' books; the degree of speculation inherent in any opinion

based on these facts, even expert opinion, leads us to conclude that it was not manifestly erroneous for the district court to exclude it. *See Twin Disc, Inc. v. Big Bud Tractor, Inc.*, 772 F.2d 1329, 1336–37 (7th Cir.1985); *cf. Kenford Co.*, 67 N.Y.2d at 262–63, 493 N.E.2d at 236, 502 N.Y.S.2d at 132–33 (expert testimony re future profits not sufficient to support damages award where testimony is based on "multitude of assumptions").

Proteus also claims that documents that the court excluded as hearsay should have been admitted into evidence. Proteus argues that these documents are "business documents," and relevant to the issue of damages. The district court was correct in ruling that without the proper foundation, these documents could not be admitted. As Proteus did not come forward with either documentary or testimonial evidence to support these business documents, they were inadmissible. Likewise, on remand, should Proteus offer these documents as evidence of its damages, they will be inadmissible if the proper foundation is not laid.

Proteus points to no additional testimony that it could have elicited from Shatzkin had he been qualified as an expert witness. Even if it could have developed opinion evidence from Shatzkin, however, the district court's ruling was not manifestly erroneous. Judge Carter ruled that Shatzkin could not be qualified as an expert witness because he was an "interested party ... a party in the case." In this situation, it could have been unduly prejudicial for Shatzkin to testify as an expert; the district court was in the best position to determine the possible effects of Shatzkin's testimony. *See Viterbo v. Dow Chemical Co.*, 646 F.Supp. 1420, 1425–26 (E.D.Tex. 1986), *aff'd*, 826 F.2d 420 (5th Cir.1987); *cf. Marshall v. Perez Arzuaga*, 828 F.2d 845, 852 (1st Cir.1987) (assuming, without deciding, that expert could be disqualified for partiality), *cert. denied*, —— U.S. ——, 108 S.Ct. 1027, 98 L.Ed.2d 991 (1988).

Finally, we see no manifest error in Judge Carter's decision not to allow Keiser's successor, Zimmerman, to testify concerning statements made to him by Cherry Lane's owners. As we read the record, these statements were not admitted because the trial court found them to be inadmissible since, even if they were relevant, their probative value was outweighed by their potentially prejudicial effect. Fed. R.Evid. 403. Cherry Lane argued at trial that statements by the Okuns, Cherry Lane's owners, to Zimmerman were "prejudicial" because of the Okuns' unfamiliarity with Cherry Lane's day-to-day operations. The district judge was in the best position to evaluate possible prejudicial effects of this testimony, and we have found no reason to overturn his decision. Nevertheless, Proteus is not precluded from raising this issue again at the retrial on its damages. Should it do so, the trial court may reconsider its ruling on whether to admit these apparent admissions by a party-opponent, should these statements be relevant to the question of how much damage Cherry Lane's incompetence caused Proteus.

## CONCLUSION

We affirm the judgment of the district court as it relates to the grant of judgment n.o.v. on the bills of exchange agreement claim, as it relates to the denial of j.n.o.v. on the minimum sales agreement and conversion claims. We vacate the judgment n.o.v. granted by the district court as to the breach of duty to perform with due professional skill and competence claim, reinstate the verdict as to liability and remand to the district court for a new trial on damages on that claim. The parties shall bear their own costs.